656 F.2d 754
 211 U.S.App.D.C. 165
 NATIONAL EASTER SEAL SOCIETY FOR CRIPPLED CHILDREN AND
ADULTS, March of Dimes Birth Defects Foundation,
American Lung Association, and St. Jude
Children's Research Hospital,
Petitioners,
v.
UNITED STATES POSTAL SERVICE, Respondent.
 Nos. 80-1491, 80-1492.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 12, 1980.
Decided May 5, 1981.
 
 William J. Olson and Alan R. Swendiman, Washington, D.C., for petitioners.
 Harold J. Hughes, Asst. Gen. Counsel, U.S. Postal Service, Washington, D.C., with whom Louis A. Cox, Gen. Counsel, and Gloria Brogan Flanagan, Atty., U.S. Postal Service, Washington, D.C., were on the brief, for respondent.
 Dana T. Ackerly, David K. Flynn, and J. Edward Day, Washington, D.C., entered appearances for intervenors Direct Mail/Marketing Ass'n, Inc. and Associated Third Class Mail Users.
 Before TAMM and MIKVA, Circuit Judges, and PHILIP NICHOLS, Jr.,* Judge, United States Court of Claims.
 Opinion for the court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 In 1970, as part of Congress' comprehensive reform of postal administration, the Postal Service was directed to ensure "the establishment and maintenance of a fair and equitable classification system for all mail." 39 U.S.C. § 3623(c)(1) (1976). This case arises from a classification decision of the Governors of the Postal Service that implemented a worksharing discount for third-class bulk mailers who presort their mail in a certain way. Although we reject most of petitioners' challenges to that decision, we agree with petitioners that the Governors misinterpreted and may have exceeded their statutory authority by phasing in the discount only as applied to nonprofit third-class bulk mailers. Accordingly, we return the matter to the Postal Service for further consideration.
 
 I. BACKGROUND
 A. The Postal Reorganization Act of 1970
 
 2
 The Postal Reorganization Act of 1970 (Act), 39 U.S.C. §§ 101-5605 (1976), created the United States Postal Service (USPS), an "independent establishment of the executive branch of the Government." Id. § 201. The Act also set up the Postal Rate Commission (PRC or Commission), an independent expert agency charged with making recommendations to the Governors of the Postal Service on rate and classification matters. See id. §§ 3601-3604, 3622-3624. One of the principal goals of the reorganization was to produce a self-supporting, efficient structure that would operate without congressional subsidies and also without excessive congressional regulation.
 
 
 3
 To that end, the Act contemplates that decisions on postal rates and classifications be made jointly by the Governors of the Postal Service and the Postal Rate Commission, acting as "partner(s), ... work(ing) together to achieve a truly effective postal service." S.Rep.No.912, 91st Cong., 2d Sess. 13 (1970). The Act provides that the Postal Service may initiate changes in postal rates and classifications by requesting that the Commission formulate a proposal. See 39 U.S.C. §§ 3622, 3623. After holding hearings and taking into account the relevant policies described in the Act, the PRC submits a recommended decision to the Governors. See id. §§ 3622-3624. The Governors, nine presidentially appointed officials who have, among other powers, the authority to act on the PRC's rate and classification proposals, then have three options: they may approve the Commission's suggestion; allow it to take effect under protest and either seek judicial review or return the issue to the PRC for reconsideration; or reject the proposal. See id. §§ 202, 3625.
 
 
 4
 If the third approach is taken, and the recommendation is rejected, the Postal Service may resubmit its request to the Commission for further study. The PRC's recommendation after reconsideration is again subject to review by the Governors, who this time have the additional option of modifying that decision under certain circumstances. See id. § 3625(d). This was the process that led to the decision on review here.
 
 B. The Controversy
 
 5
 Third-class mail, consisting primarily of circulars and catalogs, has traditionally been eligible for a bulk rate when mailed in quantity and sorted according to postal regulations. This rate, which is substantially lower than that for single-piece third-class mail, has been available to both regular (commercial) and nonprofit third-class mailers. Since 1952, the bulk rate for nonprofit mail has been less than that for regular mail. The postal regulations in effect before promulgation of the order challenged here required that bulk mail be sorted according to zip code: ten or more pieces of mail addressed to a particular zip code were to be bundled together and labelled accordingly.
 
 
 6
 On September 8, 1978, the Postal Service (respondent) submitted to the PRC a proposal for creation of a new subclassification of regular third-class bulk mail. Respondent recommended that a worksharing discount be offered to regular third-class mailers who presorted their mail according to the particular carrier routes.[1] This additional sortation was to be optional, but the discount was available only to regular third-class mailers, and not to nonprofit mailers.
 
 
 7
 The PRC permitted petitioners (NESS) to intervene and to present a parallel proposal applicable to nonprofit third-class mailers. Hearings were held, as required by section 3624(a) of the Act. During the proceedings, the PRC notified the parties that it was considering a three-tier rate structure for third-class bulk mailers the lowest rate for carrier-route presorted mail, a slightly higher rate for mail separated according to zip code, and the highest rate for all other third-class bulk mail. The Commission invited comments and heard testimony on this proposal, but did not publish notice in the Federal Register that it was contemplating a three-tier system.
 
 
 8
 On November 28, 1979, the PRC issued its first Opinion and Recommended Decision (First PRC Opinion), PRC Docket No. MC78-2, reprinted in Supplemental Appendix (SA) at 1, which included a three-tier rate structure for both regular and nonprofit third-class bulk mail.[2] The new discounts for nonprofit mailers were to be phased in over a period of years according to a schedule "which maintain(ed) the ratio of phased rates to full rates which existed prior to the restructuring of the classification schedule." Id. at 51, SA at 55.
 
 
 9
 This recommendation was rejected on December 4, 1979, by the Governors of the Postal Service, who disapproved the PRC's opinion on a number of grounds. See Decision of the Governors of the USPS re Recommended Decision of the PRC on Bulk Third-Class Mail (First USPS Opinion), reprinted in SA at 150. The Governors chastised the Commission for exceeding their statutory authority by transforming the USPS's straightforward request into a complex set of recommendations that would work substantial changes on the rate structure for third-class bulk mail. See id. at 1-2, SA at 150-51. In addition, the Governors had a number of specific objections to the PRC's decision, for example, that an increase was proposed in rates charged a majority of third-class bulk mailers, who had been given only minimal notice and no opportunity to present their views, and that the Commission lacked jurisdiction to adopt phasing schedules. See id. at 3, 5-6, SA at 152, 154-55.
 
 
 10
 After the Governors' rejection of the PRC's proposal, the Postal Service exercised its right to resubmit its request to the PRC. See 39 U.S.C. § 3625(d). Following reconsideration, the PRC issued a second opinion on March 24, 1980, with two of the five Commissioners dissenting. Opinion and Recommended Decision upon Reconsideration (Second PRC Opinion), reprinted in S.A. at 158. Although this opinion modified the first recommendation in part, the PRC refused to abandon the three-tier rate structure or the phasing schedule. The matter then went back to the Governors.
 
 
 11
 In an opinion issued April 20, 1980, the Governors utilized their statutory authority to modify a proposal submitted by the Commission after reconsideration, see 39 U.S.C. § 3625(d). Decision of the Governors of the USPS re Further Recommended Decision of the PRC on Bulk Third-Class Mail (Second USPS Opinion), reprinted in SA at 232. The Governors chose to implement a compromise settlement, reprinted in Joint Appendix (JA) at 778, which had been agreed to by respondent and five intervenors, but opposed by NESS and two other parties, and which had been recommended by the two dissenting Commissioners. Under the terms of this settlement, a two-tier rate structure was adopted for both regular and nonprofit third-class mailers: for each type of mail, the current rate was retained, with a discount added for carrier-route presorted mail. The discount was set at a level less than the cost savings expected to be realized by the Postal Service as a result of the worksharing. The Governors also modified the PRC's phasing schedule for nonprofit rates to provide an immediate 0.1cents per-piece discount for carrier-route presorted mail, which would then gradually rise to 1.1cents by July 6, 1987[3]; the entire discount for commercial mailers was to take effect at once.[4]
 
 
 12
 It is from this order that petitioners appeal. They argue that the Governors' phasing schedule for the discount is not authorized because the Act contemplates phasing only of postage increases, see 39 U.S.C. § 3626, and because applying the phase-in solely to nonprofit mailers is contrary to the Act's prohibition of undue rate discrimination, see id. § 403(c). Petitioners also challenge the Governors' decision to modify the PRC's recommendation: they insist that the Governors erred in making the required determination that the rates proposed by the PRC would not generate sufficient revenues to cover costs. Finally, NESS maintains that the Governors violated the Administrative Procedure Act by failing to afford notice and opportunity for comment.
 
 II. PHASING IN WORKSHARING DISCOUNTS
 
 13
 The Governors' phasing schedule, which applies only to nonprofit third-class bulk mailers, must be evaluated for its conformity to the Act's antidiscrimination provision, 39 U.S.C. § 403(c), which generally prohibits discrimination against any mailer with respect to rates and classifications. Section 403(c) does not forbid, however, differential treatment that is "specifically authorized" by another section of the Act. In considering petitioners' argument that phasing in the discount here was impermissible, then, the first inquiry must be whether the phase-in adopted by the Governors is specifically authorized by section 3626 of the Act, the statutory provision relating to phasing and the one on which the Governors relied in implementing the phase-in.
 
 A. Section 3626: The Phase-In Provision
 
 14
 One of the purposes of the Postal Reorganization Act was to require for the first time that preferred mailers such as nonprofit third-class mailers pay the full direct and indirect costs attributable to their mail. To mitigate the impact of the resulting increases in rates, Congress enacted 39 U.S.C. § 3626, which sets a phase-in period during which such mailers can adjust to the new rate policy. This section provides that, for qualifying mailers such as petitioners, "a separate rate schedule" will be adopted "each time rates are established or changed ..., with annual increases as nearly equal as practicable" so that the revenue generated by that mail will equal its direct and indirect attributable costs in sixteen years. Id. § 3626(a)(1).[5] We agree with petitioners that this section does not authorize the Governors to phase in rate decreases.
 
 
 15
 The concept of phasing stemmed from Congress' understandably narrow concern about the impact of rate increases on preferred mailers. When the Act was passed in 1970, no worksharing discounts were in effect, and Congress could not have envisioned the phasing of discounts. But because a primary purpose of the Act was to have previously preferred mailers start paying their own way and to get the Postal Service operating in the black, Congress did anticipate that rates for nonprofit third-class mail would increase. It was fear about the resultant financial burden on these mailers that led Congress to provide for phasing.
 
 The Senate Report noted:
 
 16
 The Committee recommends that all other preferences heretofore established by law for the mailing of any mail matter be abolished, but that the mailers be given a sufficient period of time to adjust to any impact caused by rate increases.
 
 
 17
 ....
 
 
 18
 Any mail or class of mail which under existing law pays a rate which is less than the rate established by the Postal Service in its first rate schedule shall be entitled to a period of adjustment to reach the rate prescribed.
 
 
 19
 ....
 
 
 20
 This "grandfather clause" is designed to provide adequate protection to any class of mailers or type of mail which has been established, for whatever reason, as preferred groups, or which because of the existing rate structure, do not in fact pay the fair and equitable rate as determined by the Commission.
 
 
 21
 S.Rep.No.912, 91st Cong., 2d Sess. 10, 12 (1970) (emphasis supplied).
 
 
 22
 The House Report's explanation of section 3626 is similar:
 
 
 23
 H.R. 17070 moreover, enjoins the Postal Service to take into account the financial impact upon affected users of the various classes of mail of any changes in postal rate structures. The Service is explicitly permitted to achieve the rate policy goals of H.R. 17070 over a duration of time that may be appropriate in view of the financial impact upon mailers of proposed changes. It is clear that an abrupt increase in postal rates for an enterprise relying heavily upon the use of the mails could cause a severe financial dislocation. H.R. 17070 provides for easing this impact over a period of years as the Service begins its operations.
 
 
 24
 H.R.Rep.No.1104, 91st Cong., 2d Sess. 17, reprinted in (1970) U.S.Code Cong. & Ad.News 3649, 3665-66 (emphasis supplied). See also H.R.Rep.No.1363, 91st Cong., 2d Sess. 85-86 (conference report), reprinted in (1970) U.S.Code Cong. & Ad.News 3712, 3718.
 
 
 25
 The legislative history thus makes clear that Congress was concerned about the impact on nonprofit third-class mailers of rate increases. It conceived of phasing as a way to soften the blow. Section 3626 was not meant to address the phasing of rate decreases, or the worksharing discounts at issue here, which impose no extra financial burden on nonprofit mailers. Admittedly, the statutory language is somewhat ambiguous. Section 3626 is triggered when rates are "established or changed," suggesting applicability to more than rate increases. But immediately following that phrase is the language setting out the guideline that a phasing schedule should be designed to effect "annual increases as nearly equal as practicable" (emphasis supplied). Moreover, the provision goes on to establish a sixteen-year phase-in period for increasing rates for nonprofit third-class mail. If Congress intended that the section apply also to rate reductions, one would expect analogous formulas and procedures for phasing in decreases.
 
 
 26
 Although the proper interpretation of section 3626 raises an issue of first impression, this court has always spoken as if it assumed that phasing is appropriate only for rate increases. See Direct Mail/Marketing Ass'n, Inc. v. United States Postal Service, 501 F.2d 717, 718-19 (D.C.Cir.1974) ("For certain classes of mail, including third class mail, rate increases approved by the Governors must be introduced in gradual year-by-year steps if Congress appropriates money to cover the revenue foregone by such 'phasing.' "); Association of American Publishers, Inc. v. Governors of United States Postal Service, 485 F.2d 768, 775 (D.C.Cir.1973) ("Section 3626 of the Postal Reorganization Act, 39 U.S.C. § 3626, provides for third class mail rates which are to be at a high level immediately unless there is what is called by the parties here 'the phasing of increases in permanent third-class mail rates.' "); Direct Mail Advertising Ass'n, Inc. v. United States Postal Service, 458 F.2d 813, 814 (D.C.Cir.1972) ("This section of the Act cushions the impact of the initial changes in permanent rates applicable to third-class mail by requiring that the increase over prior rates be added to the user's rates in substantially equal installments over a five year period thus the full impact of the increase is not felt until the fifth year. This is termed 'phasing-in' the full rate."), cert. denied, 409 U.S. 843, 93 S.Ct. 43, 34 L.Ed.2d 83 (1972).
 
 
 27
 This court's interpretations of section 3626 are thus consistent with the legislative purpose behind that provision, which indicates that the ambiguity in the language of section 3626 should be resolved as petitioners urge that the section was meant to ease the financial burden of rate increases and does not permit phasing of rate decreases.[6]
 
 
 28
 B. Section 403(c): Prohibition of Discriminatory Rates
 
 
 29
 Because the phase-in of worksharing discounts is not specifically authorized by section 3626, the question arises whether the phasing violates the Act's antidiscrimination provision, 39 U.S.C. § 403(c). See Direct Mail/Marketing Ass'n, Inc. v. United States Postal Service, 501 F.2d 717, 721-22 (D.C.Cir.1974). Section 403(c) provides:
 
 
 30
 In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.
 
 
 31
 This provision does not per se bar phasing of rate decreases, and we do not hold that the Governors lacked the statutory authority to phase in the worksharing discount here. But because such phasing is not explicitly authorized by the Act, any discriminatory phase-in of a rate decrease must satisfy the standards articulated in section 403(c).
 
 
 32
 The Governors did not analyze the phasing schedule they adopted in terms of that standard and saw no need to justify the disparate treatment. Instead, they felt bound by section 3626 to phase in the discount in relatively equal annual increments over the time period set by section 3626.[7] See First USPS Opinion at 5-6, SA at 154-55; Second USPS Opinion at 16-17, SA at 247-48. As discussed in the previous section, the Governors erred in relying on that provision. Because the resulting record does not enable us to judge whether the Governors would independently have opted for the phasing schedule they implemented, or whether sufficient reason exists to permit phasing in the discount for nonprofit mailers only, we must return the matter to the Postal Service for reconsideration of the permissibility and advisability of phasing the discount in light of the mandate of section 403(c).
 
 
 33
 It may be that no rationale justifies the differential treatment of nonprofit third-class bulk mailers and that the discrimination effected by the phase-in is therefore "undue" and "unreasonable," in contravention of section 403(c). The PRC specifically found that "there are no intrinsic characteristics of nonprofit mail which would warrant having different rate structures for regular-rate mail and nonprofit mail." First PRC Opinion at 40, SA at 44. See also JA at 96-104 (testimony of Arthur Porwick). By performing the same worksharing functions as regular third-class mailers, nonprofit mailers may save the Postal Service an equal amount of time and money and may incur the same costs associated with presorting. They may therefore be entitled immediately to the full benefit of the discount, which the phase-in acts to deny them during the phasing period.
 
 
 34
 On the other hand, the distinction between the rates paid by regular third- class bulk mailers and those paid by nonprofit mailers may justify phasing in the discount for nonprofit mailers only. As noted above, one of the purposes of the Postal Reorganization Act was to reduce the subsidy given these preferred mailers so that the revenue generated by nonprofit third-class mail would eventually cover all its direct and indirect costs. An unphased worksharing discount reducing the rates paid by this class of mail may be inconsistent with that plan.[8]
 
 
 35
 Even if some phase-in is appropriate, and not contrary to the Act's antidiscrimination provision, the schedule adopted by the Governors and based on section 3626 may not be the optimal one. The Governors may find, for example, that nonprofit third-class mailers should have been given more in the first year than a 0.1cents discount from the 3.1cents rate charged nonprofit mailers who did not presort, see note 7 supra, in light of the cost savings realized by the Postal Service as a result of the worksharing, or in light of the mandate of section 403(c). Or the Governors may themselves prefer a different phasing schedule, given the absence of the constraint to adhere to the schedule prescribed by section 3626.
 
 
 36
 These are some of the factors that the Governors should have taken into account in deciding whether and how to phase in the discount to nonprofit mailers, and we must remand for consideration of these issues. We do not hold that the Governors do not have the authority, implicit in their general ratemaking power, to phase in rate decreases to all mailers or even to implement the phasing schedule adopted here. But, absent some reasonable ground for differential treatment, section 403(c) forbids discriminatory phasing of discounts to only one class of mailers. Because the Governors failed to analyze the phasing schedule in those terms, and because the schedule adopted was erroneously premised on the assumption that it was dictated by section 3626, we return the matter to the Postal Service for reconsideration.
 
 
 37
 III. PROPRIETY OF THE GOVERNORS' MODIFICATION OF THE PRC
 
 RECOMMENDATION
 
 38
 Petitioners' challenge to the Governors' determination that the PRC recommendation would generate insufficient revenues is met by two replies from the Postal Service. First, respondent maintains, the Act does not require that the Governors make a finding of revenue insufficiency before modifying a PRC proposal relating to postal classifications, as opposed to rates. Second, respondent defends the Governors' conclusion as reasonable and supported by substantial evidence.
 
 
 39
 A. Finding Revenue Insufficiency as a Precondition to Modification
 
 
 40
 Respondent interprets the Act as granting the Governors more leeway in modifying a PRC recommendation regarding a classification change than one involving a change in rates. It relies on section 3625(d), which provides in pertinent part:
 
 
 41
 (W)ith the unanimous written concurrence of all of the Governors then holding office, the Governors may modify any such further recommended decision of the Commission under this subsection if the Governors expressly find that (1) such modification is in accord with the record and the policies of this chapter, and (2) the rates recommended by the Commission are not adequate to provide sufficient total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs.
 
 
 42
 (Emphasis supplied.) Respondent observes that the statute refers specifically to recommended "rates" and that revenue sufficiency is an irrelevant concept for proposals with no impact on rates; therefore, the Postal Service infers, the Governors need not make a determination of revenue insufficiency before modifying a PRC classification recommendation. Respondent characterizes this as such a case. See Second USPS Opinion at 20-21, SA at 251-52.
 
 
 43
 Petitioners maintain, on the other hand, that a finding of revenue insufficiency is always a prerequisite to modification of a PRC recommendation by the Governors. In cases involving no rate impact and thus no possible problem of inadequate revenues, the Governors may approve, allow under protest, or reject a PRC decision but they may not modify it.
 
 
 44
 Section 3626 as a whole obviously applies to more than rate proceedings. It describes the manner in which the Governors may act on a "recommended decision" of the PRC, and "recommended decisions" encompass both rate and classification issues. See 39 U.S.C. § 3624(a). There is no evidence that the Governors' modification power, which must be based on a determination that a PRC recommendation raises the spectre of deficient revenues, has a different scope. Cf. 116 Cong.Rec. 26,953, 21,712 (1970) (remarks of Sen. McGee, chairman of the Senate Post Office and Civil Service Committee, referring to revenue insufficiency finding in the context of both rate and classification recommendations).
 
 
 45
 We need not consider whether such a finding is a prerequisite for modification in a pure classification case. Like most classification proceedings, this is not a pure classification case.[9] A proposed change in postal classifications typically has an impact on revenues and is accompanied by recommended rate changes. That is the essence of a classification a grouping of mail for which a certain rate is charged. See United Parcel Service, Inc. v. United States Postal Service, 615 F.2d 102, 110-11 (3d Cir. 1980); Dow Jones & Co. v. Postal Rate Comm'n, 471 F.Supp. 455, 456 (D.D.C.1979). And here, the impact of the PRC's recommendation on revenues formed one of the basic areas of dispute between the Governors and the Commission. See part III(B) infra.
 
 
 46
 Moreover, we reject respondent's implication that a finding of revenue insufficiency was unnecessary here because the primary check on the Governors' modification power is the requirement that their decisions be unanimous and written. See Brief for Respondent at 18-19. To the contrary, the language of the statute is unambiguous in conditioning modification on both a finding of revenue insufficiency and a written, unanimous decision. See 39 U.S.C. § 3625(d). The legislative history is equally clear in emphasizing both prerequisites to modification. See, e. g., S.Rep.No.912, 91st Cong., 2d Sess. 16-17 (1970); 116 Cong.Rec. 26,953 (1970) (remarks of Sen. McGee).
 
 
 47
 We therefore hold that, in a classification proceeding such as this one, having implications for postal rates, modification of the PRC's recommendation by the Governors must be premised on a finding of revenue insufficiency. The Governors did make such a determination here, and we turn now to review that judgment.
 
 
 48
 B. Adequacy of the Governors' Revenue Insufficiency Finding
 
 
 49
 Petitioners question the Governors' finding that the three-tier rate structure recommended by the PRC would not provide sufficient revenue. Petitioners thus seek to defend the PRC's analysis of this issue. The scope of our review of the Governors' determination is a narrow one: the decision may be set aside only if it is arbitrary, capricious, or an abuse of discretion or if it is unsupported by substantial evidence. See 39 U.S.C. § 3628 (incorporating standards of 5 U.S.C. § 706 (1976)).
 
 
 50
 The Governors basically were skeptical about approving, without further study, a rate scheme of unpredictable consequences. They did not consider the PRC's radical restructuring of third-class bulk rates an appropriate response to the Postal Service's initial request for a minor classification change designed to encourage third-class bulk mailers to presort mail according to carrier route. The Governors emphasized that they were not irrevocably opposed to the PRC's three-tier proposal; they preferred to postpone discussion of such a basic change until the general rate proceeding to be held the next year.[10]
 
 
 51
 Specifically, the Governors questioned the PRC proposal's ability to generate adequate revenue on several grounds. The Governors faulted the Commission for relying on volume estimates used by the Postal Service and applicable to its original request for a two-tier rate scheme. The USPS had assumed that the extra discount for carrier-route presorting would provide an incentive for mailers to perform the additional sorting and would result in a certain amount of increased volume. The PRC borrowed those estimates in calculating the revenue to be expected from its very different plan, a plan that envisioned a three-tier rate structure never before implemented, an increase in rates for some mailers the PRC's "all other" category and a return to previously imposed sacking requirements.
 
 
 52
 The "all other" class was to include mailers who did not presort either according to zip code or carrier route, and that category now comprises sixty-two percent of regular third-class bulk mailers. Raising the rates charged those mailers, reasoned the Governors, would surely reduce volume. And the PRC could not assume that imposing a higher rate on unsorted mail would encourage mailers to presort because the current postal regulations required that mailers sort all third-class bulk mail that could be separated by zip code. The mail in the "all other" category, therefore, was primarily that going to sparsely populated areas. Mailers could only move to one of the cheaper rates proposed by the PRC by eliminating such areas from their mailing lists.[11] The Governors feared that mailers unwilling to make such a change in their audience might shift to alternate forms of delivery or otherwise reduce the amount of "all other" mail. Moreover, such mailers might decrease the quantity of mail they presorted according to zip code and carrier route, or might even decide not to use the Postal Service at all.[12]
 
 
 53
 The Governors also felt that reimposing strict sacking requirements might serve to further discourage mailers from utilizing the services of the USPS. Until 1979, the Postal Service had enforced a "one-third of a sack" rule: bulk mailers who had enough mail intended for the same zip code to fill one-third of a mail sack were required to send that mail in a sack labelled accordingly.[13] Such sacks were delivered directly to their destination. Sacks less than one-third full were not permitted; that mail had to be combined with other residue mail and sent to an intermediate point for redistribution. In 1979, the USPS abolished the "one-third of a sack" rule, thereby permitting mailers to send smaller quantities of mail directly to a destination. The PRC's proposal relied upon a return to this requirement and only for the insubstantial reason that it had been in force during the cost studies on which the PRC recommendation was based. The Governors objected to reimposition of the rule not only because the advantage of streamlining the flow of mail would be forfeited, but also because the restriction might have a negative impact on volume.
 
 
 54
 In the eyes of the Governors, these uncertainties about the effect of the PRC's proposal on volume cumulatively made the Commission's revenue forecasts suspect. And the PRC itself admitted that its plan might create shifts in volume:
 
 
 55
 In our initial opinion, we assumed that the institution of a three-tier structure would not have an impact on volumes. We made the assumption in order to be conservative in estimating revenue impact. Obviously, there will be some volume shifts as a consequence of our rate recommendations. On balance, it is our conclusion that the net effect of these volume changes will be beneficial.
 
 
 56
 Second PRC Opinion at 31, SA at 192. The Governors were simply not as sanguine.
 
 
 57
 In addition to apprehension about the effect of the PRC recommendation on volume, the Governors observed that the Commission's proposal entailed substantially greater administrative and enforcement costs because it increased the number of rates and classifications of third-class bulk mail. Moreover, the Governors pointed out that cost increases resulting from inflation during 1979, the test year used by the PRC in developing its proposal, created even more uncertainty about the accuracy of the Commission's revenue estimates and thus about the adequacy of the revenue generated by the PRC's proposed rates.[14]
 
 
 58
 Each of these considerations casts doubt on the sufficiency of the revenue to be realized by the PRC recommendation and justifies the Governors' reluctance to approve that proposal. Petitioners object that the Governors' opinion contains no charts or data and does not specify exactly what volumes, costs, and revenues the Governors foresee resulting from the PRC proposal and from the settlement agreement implemented by the Governors. We do not think that Congress intended to require that level of evidence to justify modification of a PRC recommendation. As Congressman Udall explained:
 
 
 59
 This finding does not require the Governors to prove that the recommendation produces insufficient revenue something which would be impossible for them to do before the rates have actually been placed into effect for a period of time. Instead it requires a reasonable finding, supportable and an appropriate exercise of discretion by the Governors, that the recommendation is likely not to produce the required revenue.
 
 
 60
 116 Cong.Rec. 27,606 (1970) (remarks of Rep. Udall, member of the House Post Office and Civil Service Committee).
 
 
 61
 We find that standard met here. The Governors had reasonable criticisms of the PRC recommendation, objections that are persuasive without pages of figures and data. The Governors concluded that the PRC's predictions were speculative and that such a complex, radical restructuring of rates deserved more careful study. And they raised the specific concerns discussed above that justify their skepticism. They preferred to delay consideration of the PRC's three- tier proposal until the upcoming general ratemaking proceeding and, in the interim, to approve a plan that did not require such detailed analysis and that was amply supported in the record.
 
 
 62
 The original USPS request, and the scheme eventually implemented, was very simple: a discount was to be offered to any mailer who chose to presort according to carrier route, and the amount of the discount was to be less than the cost savings realized by the Postal Service.[15] The advisability of the proposal did not depend on extensive calculations of volume, cost, or revenue. Moreover, the settlement agreement adopted by the Governors was widely supported by the parties to the PRC proceeding and was close to the system that had been in effect on a temporary basis for almost fifteen months.[16] In the face of such uncertainty about the effect of the PRC's proposal, the Governors opted for a plan that would not jeopardize the $2.4 billion of annual revenue produced by third-class bulk mail. We find this caution reasonable and therefore affirm the Governors' modification of the rate structure recommended by the PRC.
 
 
 63
 IV. APPLICABILITY OF THE ADMINISTRATIVE PROCEDURE ACT
 
 
 64
 Petitioners' final argument challenges the procedures followed by the Governors in modifying the PRC proposal. NESS maintains that the Governors did not comply with the Administrative Procedure Act's (APA) requirements that agencies publish notice of proposed rulemaking and provide an opportunity for interested persons to submit written comments. See 5 U.S.C. § 553 (1976). The Governors gave no notice that they intended to modify the PRC's second opinion and did not invite input from the public.
 
 
 65
 We hold that the Act exempts the Postal Service from these procedural requirements. Specifically, 39 U.S.C. § 410(a) provides:
 
 
 66
 Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5 (APA provisions regarding administrative procedure and judicial review), shall apply to the exercise of the powers of the Postal Service.
 
 
 67
 Petitioners attempt to avoid the impact of this provision by arguing that the APA is not a "Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds." We find this reasoning unpersuasive and unsupported by the statutory language or the legislative history. Although this issue raises a question of first impression for this court, we have hinted before that we do not find petitioners' reading of section 410(a) compelling. See National Retired Teachers Ass'n v. United States Postal Service, 593 F.2d 1360, 1364-65 & n.21 (D.C.Cir.1979). And other courts have so held.[17]
 
 
 68
 Section 410(a) is not worded to exempt the USPS only from those provisions of chapters 5 and 7 of title 5 that deal with federal contracts, property, etc. Rather, the language of the section indicates that the Postal Service is not bound by any federal law involving those particular subjects, including the two specified chapters of title 5. It seems that Congress viewed the APA as a statute pertaining to one or more of the exempt areas or at least that Congress intended to make clear that the Postal Service would not be subject to the APA. Our interpretation is corroborated by the scope of chapters 5 and 7 of title 5. They are broad, general sections not limited to specific subject areas such as federal contracts, property, or employees. Their focus is on, respectively, administrative procedure and judicial review. If Congress did not intend to exempt the Postal Service from the APA, it is not clear what other portions of those two chapters section 410(a) could have been designed to cover.
 
 
 69
 Other provisions of the Postal Reorganization Act support our reading of section 410(a). Section 410(b), which lists the exceptions to section 410(a) that is, those federal laws to which the USPS is subject includes the provisions of chapter 5 of title 5 that pertain to public information, 5 U.S.C. § 552 (1976), records about individuals, id. § 552a, and open meetings, id. § 552b. None of these statutes are any more related to federal contracts, property, or employees than is the APA. There would have been no need for Congress to specify that these laws were not included in section 410(a) if petitioners' interpretation of section 410(a) were correct.
 
 
 70
 Moreover, various provisions of the Postal Reorganization Act specifically refer to the APA and require the USPS to adhere to APA procedures in certain circumstances. See 39 U.S.C. § 3001(f) (proceedings concerning the mailability of matter); id. § 3603 (procedures of the PRC); id. § 3661(c) (PRC proceedings regarding changes affecting postal service nationwide). See also id. § 3628 (providing for judicial review of Governors' decisions in accordance with section 706 of title 5, the APA provision pertaining to judicial review). All of these sections would have been superfluous if section 410(a)'s exemption included only laws that on their face deal with federal contracts, etc., and not the APA. These explicit references to the APA thus support the inference that the statute does not apply generally to the Postal Service.
 
 
 71
 The legislative history of the Postal Reorganization Act further indicates that the USPS was not intended to be subject to the strictures of the APA. Several references to section 410(a) suggest that it was meant to be a broad exemption and to include the APA. See S.Rep.No.912, 91st Cong., 2d Sess. 5 (1970) ("The Board of Governors shall have broad authority and shall not, except as specified, be subject to Federal laws dealing with contracts, property, the civil service system, the Budget and Accounting Act of 1921, apportionment of funds, and other laws which in most instances apply to Government agencies and functions.") (emphasis supplied); 116 Cong.Rec. 21,70 9 (1970) (remarks of Sen. McGee) ("Except as specified in the bill, all laws relating to public works, contracts, employment, appropriations, budgeting, and any other laws governing agency operations are made inapplicable to the Post Office.") (emphasis supplied).
 
 
 72
 Moreover, the legislative history evidences Congress' concern that postal efficiency and modernization not be hampered by laws that would limit the discretion of the Postal Service's management. As Senator McGee noted:
 
 
 73
 Delivering the mail is simply not in the same category of policymaking and program-development as foreign policy, national defense, housing, highway construction, or health and education assistance to State and local governments. It is an essential, business-oriented service. The committee has no intention of establishing any postal system which does not have a direct and continuing responsibility to the people and to Congress, but we do believe that its role can be fulfilled with a greater degree of efficiency if it is removed from the ordinary channels, administrative controls, and legislative restrictions of other agencies in the executive branch.
 
 
 74
 116 Cong.Rec. 21,709 (1970). Thus, as noted above, Congress provided that the procedural requirements of the APA apply in certain, limited circumstances for example, when major changes with a nationwide impact are contemplated, see 39 U.S.C. § 3661(c). Otherwise, the Postal Service was to be free from interference with its efforts to remedy the management and efficiency problems by which Congress was troubled.[18] We therefore hold that, except as specifically provided in the Act, the USPS is not subject to the requirements of the APA.
 
 
 75
 Petitioners' legitimate concern that the Postal Service not lose sight of its public functions and responsibilities is met by the provisions of the Postal Reorganization Act that do mandate public proceedings in certain instances. And petitioners were given an opportunity to contribute to the decision here. The PRC held hearings on the various proposals for a discount for carrier-route presorted mail and solicited comments from interested persons. NESS participated in those proceedings and also in the settlement conferences that resulted in the agreement eventually adopted by the Governors. The Governors' basic objections to the PRC recommendation were made obvious in its first opinion, and petitioners had a chance to respond to those criticisms. They cannot argue that they were shortchanged in their attempt to advance their position before the Postal Service.
 
 V. CONCLUSION
 
 76
 As required by the Act, the Governors made a reasonable and supportable determination that the PRC's proposed rate structure would result in insufficient revenue. Their modification of the PRC recommendation was therefore appropriate. Likewise, we find no fault in the procedures followed by the Governors; petitioners were afforded an opportunity to present their views, and section 410(a) of the Postal Reorganization Act generally absolves the Governors from compliance with the specific procedural requirements of the Administrative Procedure Act. But we find that the phase-in provision of the Postal Reorganization Act, 39 U.S.C. § 3626, does not specifically authorize the Postal Service to phase in rate decreases, or the worksharing discount at issue here. Because the Governors erred in interpreting section 3626 as requiring the phase-in schedule they implemented, and in adopting that schedule without analysis of its conformity with the Act's prohibition of unreasonable discrimination, see 39 U.S.C. § 403(c), we return this case to the Postal Service for further consideration.
 
 
 77
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976)
 
 
 [1]
 The Postal Service proposed no change in the 8.4cents per-piece regular third-class bulk rate, but recommended a 1.5cents reduction to 6.9cents for mail presorted according to carrier route
 
 
 [2]
 The PRC's rate recommendations were as follows:
 Presort Level Minimum Per-Piece Rate
------------- ----------------------------
 Regular Rate Nonprofit Rate
 ------------ --------------
Carrier Route 6.2 cents 4.4 cents
Zip Code 7.8 cents 5.6 cents
All Other 8.8 cents 6.8 cents
 
 
 [3]
 This date ends the statutory phasing period set by § 3626 of the Act, see note 5 infra
 
 
 [4]
 The rates set by the Governors are indicated in the table below. Nonprofit rates shown are as fully phased; for a detailing of the yearly nonprofit rates resulting from the Governors' phasing schedule, see note 7 infra
 Presort Level Minimum Per-Piece Rate
------------- ----------------------------
 Regular Rate Nonprofit Rate
 ------------ --------------
Carrier Route 6.7 cents 5.0 cents
Zip Code 8.4 cents 6.1 cents
All Other 8.4 cents 6.1 cents
 
 
 [5]
 Section 3626(a)(1) provides in full:
 If the rates of postage for any class of mail or kind of mailer under former sections 4358, 4359, 4421, 4422, 4452, or 4554 of this title, as such rates existed on the effective date of this subchapter, are, on the effective date of the first rate decision under this subchapter affecting that class or kind, less than the rates established by such decision, a separate rate schedule shall be adopted for that class or kind effective each time rates are established or changed under this subchapter, with annual increases as nearly equal as practicable, so that
 (1) the revenues received from rates for mail under former sections 4358, 4452(b) and (c), and 4554(b) and (c) shall not, on and after the first day of the sixteenth year following the effective date of the first rate decision applicable to that class or kind, exceed the direct and indirect postal costs attributable to mail of such class or kind (excluding all other costs of the Postal Service) ....
 
 
 [6]
 Because we hold that phasing of the worksharing discount was not authorized by § 3626, we need not reach the question whether the PRC or the Governors have jurisdiction over phasing schedules under that section. We observe, however, that § 3626 seems to make phasing rather mechanical rates are to increase in relatively equal annual increments over a certain period of time. To the extent that any creativity or decisionmaking is required, the Act does not appear to suggest that this aspect of ratemaking is to be handled any differently from the others with an initial recommendation by the PRC to be acted upon by the Governors. On the other hand, the original Senate bill did specify that the Governors were to have the power to adopt phasing schedules. See S. 3842, 91st Cong., 2d Sess. § 3704(i) (1970); see also S.Rep.No.912, 91st Cong., 2d Sess. 12 (1970). Although the version of the Act that emerged from conference omitted any reference to the Governors' authority over phasing schedules, the conference report indicated that the Senate's phasing provision had been adopted with only one amendment, which did not pertain to the question of jurisdiction. See H.R.Rep.No.1363, 91st Cong., 2d Sess. 85-86 (conference report), reprinted in (1970) U.S.Code Cong. & Ad.News 3712, 3718
 
 
 [7]
 The phasing schedule set by the Governors was as follows:
 MINIMUM PER-PIECE RATE
 Presort Level
 -------------
 Carrier Route Zip Code All Other
 ------------- -------- ---------
Year
----
1979 3.0 cents 3.1 cents 3.1 cents
1980 3.2 cents 3.5 cents 3.5 cents
1981 3.5 cents 3.9 cents 3.9 cents
1982 3.7 cents 4.2 cents 4.2 cents
1983 4.0 cents 4.6 cents 4.6 cents
1984 4.2 cents 5.0 cents 5.0 cents
1985 4.5 cents 5.4 cents 5.4 cents
1986 4.7 cents 5.7 cents 5.7 cents
1987 5.0 cents 6.1 cents 6.1 cents
 
 
 [8]
 A worksharing discount is a quid pro quo for efforts expended by mailers to save the Postal Service time and money, and is intended to be less than the Postal Service's actual cost savings. To that extent, a full, unphased discount would not increase the per-piece subsidy to preferred mailers. But giving the full discount immediately to those nonprofit third-class mailers who presort may amplify the artificially low level of their rates and inflate the volume of nonprofit third-class mail, thereby greatly increasing the total subsidy received by those mailers
 
 
 [9]
 Respondent is able to point to only one pure classification case, PRC Docket No. MC77-2, which set minimum size requirements for mail and effected no change in rates
 
 
 [10]
 Moreover, the Governors noted, the PRC has the authority to initiate a classification proceeding on its own by submitting a recommendation to the Governors. See 39 U.S.C. § 3623(b)
 
 
 [11]
 The PRC admitted that its three-tier plan might have an impact on a third-class bulk mailer's choice of audience. See Second PRC Opinion at 23 & n.2, SA at 184 & n.2. The Governors were unwilling to approve a proposal with such public policy implications without further study
 
 
 [12]
 Petitioners respond that any loss of revenue resulting from a decrease in the volume of "all other" mail would be offset by the corresponding reduction in the cost of handling that mail. This argument depends upon petitioners' assertion that the PRC's recommended rate for "all other" mail 8.8cents is roughly equivalent to the per-piece attributable cost of such mail 8.8043cents. It is not obvious, however, that this comparison is a valid one. The PRC's cost estimate was derived from the current figure for total attributable costs for all regular third-class bulk mail. That latter figure includes both short- and long-run variable costs, costs that would not be recovered immediately if volume dropped. The Commission had to make various other hypotheses in translating the current cost figure for regular third-class mail into one applicable to the "all other" category, and those assumptions cast further doubt on the accuracy of the cost estimate. See Brief for Intervenors Direct Mail/Marketing Association, Inc. and Associated Third Class Mail Users at 7-10
 
 
 [13]
 The rule was initially promulgated because the Postal Service paid a piece charged to railroads and terminal companies for each sack of mail handled, as well as a charge based on mileage and weight
 
 
 [14]
 Petitioners characterize this argument as bogus because the settlement agreement eventually adopted by the Governors simply provided a discount for carrier-route presorted mail and left as is the rates charged other third-class bulk mailers, rates that were based on a cost study conducted even before the one on which the PRC's proposal depended. We do not find this criticism persuasive. The Governors' aim was limited: they determined that the status quo should be maintained, with the exception that a discount would be given for carrier-route presorting. It was not incumbent upon them simultaneously to revise all other rates to account for inflation; in fact, they specifically wanted to delay consideration of such basic changes until the forthcoming general ratemaking proceeding. At the same time, the Governors could reasonably object that the PRC's more radical restructuring of third-class bulk rates did not reflect the impact of inflation on costs
 
 
 [15]
 The record supports the Governors' determination that the per-piece cost savings attendant carrier-route presorting exceeds the 1.7cents discount they approved. See JA at 106-11 (testimony of Douglas Madison), 191-94 (testimony of Duane Redic), 246-48 (testimony of Richard McKowen), 274-75 (testimony of Arthur Eden), 283-85 (testimony of Lawrence Lewin)
 
 
 [16]
 On January 28, 1979, the Postal Service had implemented its original proposal for a 1.5cents discount for carrier-route presorted mail, see note 1 supra, under its authority to effect temporary changes in classifications when the PRC has not issued a decision within a certain time after the Postal Service requests a recommended decision on a classification change. See 39 U.S.C. § 3641(e)
 
 
 [17]
 See NAACP v. United States Postal Service, 398 F.Supp. 562, 563 (N.D.Ga.1975); Parsons v. United States Postal Service, 380 F.Supp. 815, 818 (D.N.J.1974); Buchanan v. United States Postal Service, 375 F.Supp. 1014, 1018 (N.D.Ala.1974), aff'd in part, 508 F.2d 259 (5th Cir. 1975). Cf. Wallach v. United States Postal Service, Civ. No. 79-3323 (S.D.N.Y. May 1, 1980); Neal v. United States Postal Service, 468 F.Supp. 958, 961 (D.Utah 1979); Lester v. United States Postal Service, 465 F.Supp. 545, 546-47 (D.Ariz.1979); Burns v. United States Postal Service, 380 F.Supp. 623, 626 (S.D.N.Y.1974) (cases involving federal employees, but implying that Postal Service is generally exempt from the APA). But see National Retired Teachers Ass'n v. United States Postal Service, 430 F.Supp. 141, 147 (D.D.C.1977), aff'd on other grounds, 593 F.2d 1360 (D.C.Cir.1979)
 
 
 [18]
 See also Buchanan v. United States Postal Service, 508 F.2d 259, 263 (5th Cir. 1975) (describing provisions regarding administrative procedures and judicial review that appeared in early versions of the Act but were deleted at conference, and inferring that Congress intended to give the Postal Service broad management authority and discretion over procedures)