UNICOVER CORPORATION and Mystic Stamp Company, Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, Defendant.

No. 94 CV 0173 J.

United States District Court, D. Wyoming.

Aug. 5, 1994.

**1438**

W. Perry Dray, Brandin Hay, Dray, Madison & Thomson, Cheyenne, WY, for Unicover Corp.

Michael B. Rosenthal, Hathaway, Speight, Kunz & Trautwein, Cheyenne, WY, for Mystic Stamp Co.

Carol A. Statkus, Asst. U.S. Atty., U.S. Attorney's Office, Cheyenne, WY, for U.S. Postal Service.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALAN B. JOHNSON, Chief Judge.

This matter came before the court on July 19 and 22, 1994 for hearing on a Motion for Preliminary Injunction combined with trial on the merits of a Complaint for Declaratory and Injunctive Relief.

The court having considered the Complaint, Answer, the Motion for a Preliminary Injunction, the Opposition thereto, the memoranda, the exhibits and testimony adduced at trial, having granted Mystic's Motion to Intervene as plaintiff, having granted the United States Postal Service's Motion to Combine hearing with trial on the merits, and being fully advised does hereby find and conclude as follows.

### FINDINGS OF FACT

1. The Postal Service has a commemorative stamp program. The purpose of the program is to commemorate the cultural heritage of the United States. The program does so by recognizing events, people and places in the design of postage stamps. It is considered a great honor to be pictured on a United States postal stamp. By so honoring the chosen subjects, the program brings to light some contributions to the nation's history which would otherwise be unrecognized.

2. Out of the approximately 40 to 41 billion stamps the post office issues each year, 9 billion are commemorative stamps. Typically, each year the commemorative program includes approximately 125 designs and 30 to 35 different subject matters. Each year the Citizens' Stamp Advisory receives approximately 30,000 requests for new stamp subjects from the public. It distills these proposals into a few recommendations from which the Postmaster General makes the final selection.

3. The commemorative stamp program is important to the Postal Service because many of the commemorative stamps are purchased and held by collectors and are never used for postage. The profits from such stamps purchased for other than postal purposes are called retention revenues and are a significant source of funds through which the Postal Service supports its operations. The Postal Service's projected retention revenues for fiscal year 1994 are $253,500,000.

4. The Postal Service regulations provide:
Section 162.1 *Purpose.* Commemorative stamps and postal stationery (postal cards, embossed stamped envelopes, and aerogramme) explain the cultural and historical heritage of the United States. They describe our Nation's achievements, portray the natural wonders of our country, instill pride in America, and focus attention on worthy causes, issues, and interests of national concern. The USPS encourages the widespread use of these stamps and stationery items to promote national ideals, progress, and heritage. Commemorative stamps are not intended to replace regular stamps of the same class, but clerks are

encouraged to promote and sell them to all customers, not just stamp collectors.

\*  \*  \*  \*  \*  \*

162.3 *Philatelic Products.* Philatelic products are designed and sold to promote the enjoyment and the informative value of stamp collecting.

Domestic Mail Manual §§ 162.1 and 162.3.

5. The popularity of stamp collecting in general and the commemorative stamp program in particular has led to the development of support businesses in the private sector. Plaintiff Unicover is a private corporation which supplies its customers with philatelic products. Twenty-five percent of its business consists of a philatelic product called "first day covers". First day covers include a stamp, an envelope (commonly printed with a design relating to that stamp) and a first day of issue cancellation.

6. Unicover offers its customers subscriptions that include a first day cover of every United States commemorative and special stamp issued by the Postal Service. It is extremely important to the success of the subscription programs that every stamp be included because many stamp collectors place great emphasis on completeness. Unicover's president, Mr. James A. Helzer, is an expert on stamp collecting. He testified that such collectors will cease collecting rather than continue an incomplete collection.

7. Plaintiff in Intervention Mystic Stamp Company is in the business of selling stamps. It is the largest private seller of mint stamps in the United States. Commemorative stamps are its most popular products. Its heritage program has over 5,000 subscribers. This program offers the subscriber every United States commemorative stamp from 1935 through 1995. Mystic advertises the Heritage collection of commemorative stamps as "including all the scarce ones."

8. Mystic and Unicover are two of the Postal Service's largest customers. The Postal Service calls Mystic every week to collect its stamp order. Mystic and Unicover provide products and services that promote and enhance stamp collecting and thereby increase the Service's profits from retained revenue. The Postal Service has never failed to supply Mystic and Unicover with all the mint condition stamps they wanted. Their customers are accustomed to obtaining stamps through them rather than through the Postal Service.

9. Every United States postage stamp is assigned an issue date. Until it is issued, a stamp does not become a United States postal stamp. A newly issued stamp is usually available in specified cities on the date of issue, and then goes on sale nationwide the next day.

10. In 1994, the Postal Service was prepared to launch a new "brand" or format of commemorative stamps called Classic Collection. This format is especially designed to appeal to the younger, casual collector and features sheets of 20 semi-jumbo size stamps colorfully depicting topical subject matter with broad appeal. The sheets in the Classic Collection will have a title, a non-stamp header above the actual stamps and will have information printed on the back of the stamps. The first in this series is called "Legends of the West" and depicts such colorful and legendary Americans as Wyatt Earp, Buffalo Bill and Sacagawea. One of the Americans to be honored in the Legends of the West series is Bill Pickett, a black cowboy, who, among his other accomplishments, is credited with originating the rodeo event of steer wrestling.[1] The scheduled issue date for the Legends of the West series was March 29, 1994.

11. The Postal Service contracts out the printing of stamps including the planned 400 million "Legends of the West" stamps. The series was to be printed on sheets of 20 with one stamp on each sheet representing Bill Pickett. However, in January of 1994, after 104 million stamps (5.2 million sheets) of the first print run were printed,[2] the Postal Ser-

---

[1] In 1904, Bill Pickett performed here in Cheyenne, Wyoming, at an early Frontier Days rodeo. The newspaper of the time enthusiastically reported his daring feats. R. Hanesworth, *Daddy of 'Em All, The Story of Cheyenne Frontier Days* 46–48 (1967).

[2] The first print run was to be 250 million stamps—the second print run was to be 150

vice learned that the picture on the Bill Pickett stamp was definitely not Bill Pickett. Instead, it was probably his brother, Ben Pickett. In addition, the Postal Service learned that the back of the stamp was printed with the incorrect year of Ben Pickett's birth.

12. Ben Pickett was the businessman of the family business, Pickett Brothers Bronco Busting Company, and his life was very different from that of his brother, Bill. Bill Pickett had been a public figure and cowboy since he was 12 years old and had performed all over the world. In contrast, Ben Pickett was not a cowboy, was not a public figure and wore a cowboy hat only when posing for a picture.

13. The Postal Service was notified of the error by Mr. Frank Phillips, Jr., a great-grandson of Bill Pickett. Mr. Phillips testified that for many years the role of African-American cowboys in the West had been suppressed and deleted from written accounts of the West. During this time, the history of Bill Pickett's accomplishments was kept alive by his family, particularly by Mr. Phillips's grandmother who was Bill Pickett's second daughter. It was from this grandmother that Mr. Phillips learned Bill Pickett's history. Mr. Phillips is the Vice-Chairman of the Bill Pickett Family Foundation. He has written articles about his great grandfather and gives educational presentations about him. Mr. Phillips is acting as spokesman for the Pickett family in its dealings with the Postal Service involving the stamp.

14. In recent years, recognition of the role of African-American cowboys in the West has begun to emerge. Bill Pickett has been inducted into the National Cowboy Hall of Fame in Oklahoma, is recognized for his accomplishments by the Professional Rodeo Cowboys Association at Colorado Springs, Colorado, has been honored by the State of Texas and was selected as one of the individuals honored in the Legends of the West series.

15. When the role played by African-American cowboys in the West started to emerge in the 1960s, a book was written about Bill Pickett. The author used a photo identified as "B. Pickett" for Bill Pickett on the cover and inside the text. Unfortunately, the picture was of the wrong B. Pickett.[3] Mr. Phillips's grandmother noticed the error on the book cover and protested. As a result of her protest, new covers were printed and substituted. But the erroneous picture on the inside remained and is the source of the mistake on the stamp.

16. In January 1994, after being notified of the mistake, the Postal Service recalled the erroneous stamps. However, the stamps had been shipped from the printers directly to post offices nationwide and a Postal Service audit revealed that 183 sheets containing the Pickett error stamp were missing. The service discovered that in four locations nationwide the Legends of the West sheets had been sold before the issue date. At least one of the erroneous Bill Pickett stamps had been sent through the mail. This unauthorized sale of the unissued erroneous stamps created an unintended rarity. This was the first time in the history of the United States Postal Service that the wrong person or place had been depicted on a stamp. Previously, rare stamps had been created by errors in the printing process, or by errors in the printed information about the subject in the selvage of the stamp sheets. The Pickett error stamp was the first time a stamp pictured the wrong individual.

17. After it discovered the missing sheets, the Postal Service consulted with the Pickett family and obtained their reluctant acceptance of its plan to issue just 150,000 more sheets to the public. The issuance of the 150,000 sheets had a dual purpose in covering the cost of printing the erroneous sheets and alleviating concerns about the unintended rarity.

18. Under the Postal Service's plan, the 150,000 sheets will be distributed to appli-

---

million. Of the first run of 250 million, 104 million were printed and the rest were in various stages of production when the error was discovered.

3. There were at least three "B. Picketts" in Bill Pickett's immediate family; Bill—and his brothers, Ben and Barry.

cants who mail a request directly to the Postal Service between October 1 and 31, 1994. The sale is limited to one sheet per customer. If there are more than 150,000 applicants, orders for the stamps will be filled based on the date of the postmark. If more than 150,000 orders are postmarked October 1, 1994,[4] the post office will randomly select from those orders.

19. Under the Postal Service's planned distribution, the 150,000 sheets will be sold at face value. They will be shipped in protective plastic sleeves clearly stating the error and that the erroneous Bill Pickett stamps are intended to be saved and not used.

20. Mr. Phillips testified that the Bill Pickett family is unhappy that any of the erroneous stamps are to be released, but have reluctantly accepted the release of enough sheets to cover the costs of printing. Mr. Phillips testified that he and his family would consider the release of all of the rest of the already printed 5.2 million sheets containing Pickett error stamps to be an insult to his family, to black cowboys and to all African–Americans. He believes that after years during which the contribution of black cowboys has been unjustly censored, it would be a fraud and an insult to now have the first wrongfully identified individual ever portrayed on a U.S. postage stamp to be a black cowboy.

21. The Postal Service considers the Pickett error stamps to be a defective product and it does not wish to profit from the sale of such a defective product. Mr. Azeezaly S. Jaffer, the Postal Service's manager of stamp services explained the Postal Service's reasons for declining to issue more than 150,000 more Pickett error stamps in a June 28, 1994 letter to Mr. Helzer, the president of Unicover:

> In reaching the decision to release 150,000 of the 5.2 million sheets, we recognize that this quantity would not adequately satisfy all the demands of the philatelic community, but it does not create a rarity. While there were a variety of factors and options

to be considered, the major strategies that formed the foundation for our decision are as follows:

- Maintaining the integrity and credibility of the commemorative stamp program.

- Reiterate that values associated with the stamp program take priority over generating revenue.

- Minimize perception of commercializing the inaccurate stamps.

- Minimize the possibility of the inaccurate stamps overshadowing the correct version.

- Fulfilling our moral and ethical obligation to the name, image and likeness of Bill Pickett and his descendants.

> ... Also, by limiting this sale to a very specific time period and to a very specific process, we anticipate that only the most serious customers will take advantage of the opportunity. Finally, we ensured randomness (nondiscrimination) by selling on a "first-come, first-serve" basis, one to a customer.

22. Except for those 150,000 stamps it directly distributes, the Postal Service plans to destroy all of the rest of the Pickett error stamps. Under the Postal Service's distribution plan, Mystic and Unicover would each be able to obtain only one sheet, each containing one Pickett error stamp. The presidents of both plaintiffs testified that their resultant inability to provide their subscribers with the rare Pickett error stamps will reduce their revenues and permanently and irreparably harm the reputation and good will of their companies.

23. Despite the statement in its policies (Transition Book[5] § 163.521(b)) that commemorative stamps should be sold within 60 days of being placed on sale, the Postal Service's general practice is to leave the stamps on sale for a year and then to destroy any unsold commemorative stamps after the year.

---

4. October 1, 1994 is a Saturday. The Postal Service will stamp items received on a Saturday with that date's postmark even if the post office is closed on Saturday.

5. The Postal Service's policies and regulations are contained in the Domestic Mail Manual and the Domestic Mail Manual Transition Book (Transition Book) as more fully described infra.

**1442**

24. The cost of destruction of unsold stamps, including commemorative stamps is a regular item in the Postal Service's budget. Similarly, the destruction of "defective stock" is a regular part of the Postal Service's operations. According to Handbook F–1, Post Office Account Procedures, section 426.39, defective stock includes: defective stamps or stamped paper with "obvious printing and production errors." (Government's Exhibit A)

25. The Pickett error sheets were never issued as United States postal stamps. When the 150,000 sheets containing the Pickett error stamps are sold, the Pickett error stamps will not be issued United States postal stamps. The remaining 19 stamps on the sheet are the identical stamps that will be issued in the Legends of the West series and will, when the series is officially issued later this year,[6] become issued stamps.

26. In addition to supplying private companies with stamps for subscription programs, the Postal Service runs its own subscription program for commemorative stamps. None of the customers in the Postal Service's subscription program for commemorative stamps will receive the Pickett error stamps through its regular programs because the Pickett error stamps are not issued stamps.

27. There is no evidence that the Postal Service's plan to distribute 150,000 Pickett error sheets discriminates against plaintiffs. To the contrary, plaintiffs each have the same chance of obtaining a Pickett error sheet as does any other user of the mails. The Postal Service's distribution plan does not grant any preference to any user of the mails.

28. On June 30, 1994, Unicover filed this case seeking an injunction preventing the Postal Service's planned destruction of all but the 150,000 Pickett error stamps, seeking declaratory judgment that the Postal Service's regulations prohibit the destruction of

any commemorative stamps, and requiring that the error stamps be sold to prevent the creation of a philatelic rarity. The Postal Service's answer contests that the regulations at issue are judicially reviewable.

29. This court granted a 20–day temporary restraining order preventing the stamps from being destroyed prior to opportunity for a full hearing on the merits. Mystic Stamp Company has intervened as plaintiff.

## CONCLUSIONS OF LAW

Unicover and Mystic contend that the Postal Service rules and regulations prohibit the Postal Service from creating a "rarity" and from destroying commemorative stamps and therefore it must distribute the Pickett error stamps to such regular customers as themselves. Plaintiffs further contend that the regulations allowing first day cover suppliers to have direct access to commemorative stamps create a "partnership" with the Postal Service and that those regulations give them standing to ensure they are enforced.

The Postal Service contends that the portions of the Domestic Mail Manual Transition Book in question are only internal instructions to postal employees and do not create any right or benefit enforceable at law as independent causes of action against the Postal Service. It further contends that even if the Transition Book contains regulations; (1) the Postal Service's compliance with the regulations is not judicially reviewable because the decision to issue only 150,000 Pickett error stamps is in the discretion of the Postal Service; and, (2) the Postal Service has not violated the regulations.

Federal district courts have original jurisdiction of any civil action arising under any Act of Congress relating to the Postal Service, 28 U.S.C. § 1339, and original but not exclusive jurisdiction over all actions brought by or against the Postal Service, 39 U.S.C. § 409(a).[7]

---

**6.** October 1, 1994 is the planned issue date for the corrected Legends of the West stamp series.

**7.** This case does not involve an issue of sovereign immunity. 39 U.S.C. § 401(1) provides the Postal Service may "sue and be sued in its official

name." This is a waiver of sovereign immunity. *Continental Cablevision v. U.S. Postal Service,* 945 F.2d 1434, 1437 (8th Cir.1991); *Peoples Gas, Light & Coke Co. v. U.S. Postal Service,* 658 F.2d 1182, 1189 (7th Cir.1981).

However, these statutes do not by themselves create a cause of action, but merely give this court jurisdiction over an otherwise existing cause of action. *Peoples Gas, Light & Coke Co. v. U.S. Postal Service,* 658 F.2d 1182, 1189 (7th Cir.1981). Thus, we must determine if the regulations at issue provide a private cause of action and therefore provide an independent basis to review the decision to destroy all but 150,000 of the stamps. *Id.; Tedesco v. U.S. Postal Service,* 553 F.Supp. 1387, 1388 (W.D.Pa.1983).

The regulations at issue originated in the Postal Service's Domestic Mail Manual which is incorporated by reference into the Code of Federal Regulations. 39 C.F.R. § 111.1 (July 1, 1992 revision). In 1993, the Postal Service reorganized and rewrote its Domestic Mail Manual. Under the reorganization, many provisions formerly in the Domestic Mail Manual were transferred to a new document called the Domestic Mail Manual Transition Book, (Transition Book) which is part of the Domestic Mail Manual and thereby incorporated by reference into the Code of Federal Regulations. 58 Fed.Reg. 34,887 (June 30, 1993). Originally the Transition Book had an expiration date of one year. *Id.*

> The purpose of this 1 year period was to allow the Postal Service to make a thorough review of these regulations and provisions and to decide whether to incorporate them into other documents, to publish them as mail classification rulings, or to rescind them ... several changes have been made to the Transition Book since its publication; however, the evaluation process is not yet complete.
> The Postal Service has therefore determined to rescind the ... expiration date of the Transition Book. ... the Transition Book will remain in effect until all remaining material has been transferred.

59 Fed.Reg. 31655 (June 20, 1994) (extending expiration date until all remaining materials have been transferred).

"[I]nternal instructions to employees" and "philatelic procedures" were among the categories of regulations that were transferred to the Transition Book. *Id.* The following sections at issue herein were all transferred to the Transition Book:

Section 161.3 **Integrity of Program.** Uniform application of policies provides a high degree of integrity for the entire program. All post offices, postal employees, and contractors must comply with the policies set forth in this subchapter. *The Postal Service must avoid the creation of philatelic rarities.*

\*    \*    \*    ·\*    \*    \*

Section 163.521 **Commemorative Stamps**

a. *It is the Postal Service's intent that all commemorative stamps be sold and none destroyed.*

b. Offices must place commemorative stamps on regular sale, holding aside only enough for the local philatelic demand. All supplies should be sold within 60 days after being placed on sale.

\*    \*    \*    \*    \*    \*

Section 164.841 **First–Day–of–Issue Cancellations.**

Customers recognized as first-day cover servicers are permitted, though not required, to purchase mint stamps by mail from the first-day post office or from the Philatelic Sales Division *on the date of issuance.*

(Emphasis added).

In addition, the Postal Service contends that section G900.1.3 of the Domestic Mail Manual, which was not moved to the Transition Book, gives it authority to sell the stamps under the plan of distribution. That section provides, "the USPS may limit or set conditions on the purchase of stamps and other forms of postage or postal stationery."

■ Generally, the Postal Service's regulations do not create a private cause of action of their own force. *Tedesco v. U.S. Postal Service,* 553 F.Supp. 1387. (Postal Reorganization Act's section providing that the Service has a duty to provide prompt, reliable and efficient service does not give rise to a private cause of action by people seeking to have post office established in their town); *Shelby Resources v. U.S. Postal Service,* 619 F.Supp. 1546, 1549 (S.D.N.Y.1985) (District

Court has no jurisdiction to compel Postal Service to follow its own regulations).

■ In determining whether a statute provides a private cause of action in favor of an aggrieved party for the breach of duties imposed by the statute the "weightiest factor" is Congressional intent to create or deny the private remedy.[8] *Miller v. United States,* 710 F.2d 656, 667 (10th Cir.1983) quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). The relevant[9] factors to be considered are:

First, is the plaintiff "one of class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted) (emphasis in original).

■ A review of the Transition Book reveals it generally consists of matters committed to the discretion of the Postal Service. Accordingly, the Postal Service is reviewing and discarding,[10] changing, keeping and moving this set of regulations and policies as is needed to make its operations more efficient. There is no indication from the language of the regulations, or from the Postal Reorganization Act that the regulations were created or intended to especially benefit any persons. The language or history of the matters in the Transition Book do not show an intent to create a right or remedy in third parties.

■ Additionally, the court finds and concludes that sections 163.521(a) and 164.841 of the Transition Book apply only to issued stamps. Because the Pickett error stamps were never issued, these regulations simply do not apply in this case.

The cases that hold the Postal Service Regulations are judicially reviewable, generally do so in the context of regulations enacted in response to non-postal federal statutes. For example, to the extent that the Intergovernmental Cooperation Act (ICA) and Executive Orders required the Postal Service to promulgate regulations implementing the ICA, the Postal Service complied and enacted a series of regulations. It is these regulations implementing the ICA which two of the cases relied upon by plaintiffs construe: *City of Waltham v. U.S. Postal Service,* 786 F.Supp. 105, 141–2 (D.Mass.1992) (plaintiff had standing to enforce Postal Service's compliance with its regulations related to National Environmental Policy Act); *Village of Palatine v. U.S. Postal Service,* 742 F.Supp. 1377 (N.D.Ill.1990) (even if Postal Service exempt from Administrative Procedures Act, "arbitrary and capricious" standards from Act should be applied in review of Service's compliance with its regulations regarding environmental impact study).

Because the *Waltham* and *Palatine* cases involve regulations promulgated to comply with the ICA, another federal statute, those cases are distinguishable from cases like the present case where only Postal Service Regulations are at issue.

In the case of *Peoples Gas, supra,* 658 F.2d at 1190 the Seventh Circuit stated that a validly issued Postal Service regulation *may* provide an independent basis for jurisdiction to review an agency determination. However, that court also found a gas company lacked standing to challenge the Postal Service's procurement decision to construct an electronically-powered rather than a gas-powered, plant to heat a new post office

---

8. One court has held that there is no need to engage in the analysis of *Cort v. Ash* to determine if a private cause of action exists for the Postal Service's violation of a statutory duty, because courts lack subject matter jurisdiction to review plaintiff's complaints against the Postal Service. *Shelby Resources, Inc.,* 619 F.Supp. at 1549. Nonetheless, this court will address the issue.

9. The fourth factor articulated in *Cort,* whether the cause of action is one "traditionally relegated to state law," is not applicable to this case.

10. The discrepancy between the Transition Book's statement regarding the length of time stamps are for sale (60 days) and the length of time the Postal Service actually offers them for sale (one year) is an example of how outdated items in the Transition Book can be.

because although it was a provider of gas, it did not establish an interest of its own that was arguably protected by the Postal Service regulations. *Id.* at 1200–1202. Accordingly, the Seventh Circuit held that "in view of the strong interest expressed by Congress in promoting the operational efficiency of the Postal Service, and Congress's express desire that the Postal Service operate in a business-like fashion, we believe that it is inappropriate under the present circumstances to subject the Postal Service's decision ... to judicial scrutiny." *Id.* at 1202.

The Administrative Procedures Act prohibits review of an agency's administrative decision if: (1) a statute precludes review; or, (2) the action is committed to agency discretion by law. 5 U.S.C. § 701(a).

■ In the present case the review of a Postal Service administrative decision is prohibited by statute. 39 U.S.C. § 410(a). Further, the matters at issue are committed to the discretion of the Postal Service as a matter of law because the regulations provide no meaningful standard against which to judge the agency's exercise of its discretion in the matter of distribution of defective and unissued stamps.

Where a statute is drawn so that a court would have no meaningful standard against which to judge the agency's discretion, it means that the statute "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely.... [I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Sierra Club v. Yeutter,* 911 F.2d 1405, 1411 (10th Cir.1990) (challenging Forest Service's failure to act under discretionary statute allowing Forest Service to spend sums "as may be necessary" for given purpose) quoting *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

In the present case, the regulations at issue provide that the Postal Service "must avoid the creation of philatelic rarities." However, because this sentence immediately follows the sentence directed at "all post offices, postal employees, and contractors" the court must find and conclude that section 161.3 is directed to internal instruction for the Service and does not create any right or benefit that is enforceable by third parties.

Further, the regulations offer no standards, judicially manageable or not, for judging how the agency is to handle the situation where a philatelic rarity was inadvertently created.

The regulations do not provide any guidance whatsoever for determining what is a "philatelic rarity." The regulations give no guidance for this court to determine at what point a philatelic rarity is "created": is it when a stamp is designed, printed, sold, sent through the mail, or when it is issued? The regulations do not provide any guidance whatsoever in determining what actions the Postal Service must take, or not take, in order to "not create a philatelic rarity." The regulations do not give any guidance on whether, or to what extent, the Postal Service should dilute a rarity if one was unintentionally created. The regulations do not provide any guidance for determining if the Postal Service must compromise the integrity of its commemorative stamp program by widely distributing a defective product if a philatelic rarity is unintentionally created. In short, the regulations at issue simply do not direct the agency to take or avoid any specific action that is capable of judicial review. Instead, it is merely a statement of general goal or policy. How that goal or policy is achieved is left to the discretion of the Postal Service.

There was a universe of solutions available to the Postal Service in addressing the problem of the Pickett error stamps that were subject to unauthorized release prior to issuance. For example the Postal Service could have chosen to destroy all of the remaining Pickett error stamps; it could have chosen to release any number from one to 5.2 million of the already printed Pickett error sheets; it could have chosen to print millions of additional erroneous stamps. Where the regulation in question gives absolutely no manageable standards for judging how and when the Postal Service should meet its goal of not creating a philatelic rarity, it would be

impossible for any court to evaluate its actions for an abuse of discretion. Accordingly, because the regulation at issue is not capable of meaningful judicial review, the regulation can only be taken to have committed the decision-making to the Postal Service's absolute discretion as a matter of law.

Further, even if the Postal Service's compliance with its regulations were judicially reviewable, plaintiffs have not established their standing to challenge its actions.

A plaintiff has standing to obtain review of agency action if he has suffered a "legal wrong," or, if not, he has been otherwise "adversely affected or aggrieved by agency action within the meaning of a relevant statute." ... [A] legal wrong is an invasion of a "legal right," that is, "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which concerns a privilege." *Tennessee Power Co. v. T.V.A.*, 306 U.S. 118, 137–138, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939).

\* \* \* \* \* \*

[Adversely affected] means "arguably within the zone of interest to be protected or regulated by the statute ... in question." [*Data Processing Service v. Camp*,] 397 U.S. 150, 153, 90 S.Ct. [827] at 830 [25 L.Ed.2d 184] [1970].

*NCAA v. Califano*, 622 F.2d 1382, 1386 (10th Cir.1980).

In the present case, the regulation or policy in question does not clearly protect any particular zone of interest. The regulations could fairly be interpreted as requiring nothing more than that the Postal Service avoid *intentionally* creating a philatelic rarity. The regulations referring to first day cover providers allow them to purchase stamps directly *on the date of issue*. Thus, they create only a right to directly purchase stamps after they are issued. The regulations do not purport to create or confer any other rights in favor of first day cover servicers.

Plaintiffs are customers of the Postal Service. There is no evidence in this case that they have any status other than that of large and valued customers. Plaintiffs have found a profitable niche in the marketplace between the Postal Service and stamp collectors. They provide services and products to their customers, such as first day covers, that enhance stamp collecting and make it more enjoyable. The relationship is profitable to the Postal Service and plaintiffs. Nonetheless, it is a customer-supplier relationship and not, as claimed by plaintiffs, a partnership. Thus, plaintiffs have no special standing to challenge the Postal Service's exercise of its absolute discretion under its regulations in the area of release of unissued stamps. Therefore, plaintiffs have not established that they are within the zone of interest protected by the policy or regulation stating that the Postal Service "must avoid the creation of philatelic rarities."

Plaintiffs also rely on 39 U.S.C. §§ 404(a)(4) (Postal Service has power to provide and sell postage stamps as may be necessary or desirable); (a)(5) (Postal Service has power to provide philatelic services) and 403(c) (Postal Service shall not make any undue or unreasonable discrimination among users of the mail), as establishing a statutory obligation to provide philatelic services on a non-discriminatory basis. These general grants of power do not establish any specific obligations concerning philatelic services and do not create any rights enforceable by users of philatelic service. *Tedesco*, 553 F.Supp. at 1389 (general policies and duty provisions found at sections 404(a)(3) and 403(b)(3) do not provide for a cause of action against the Postal Service). Further, the Postal Service has not even arguably violated sections 404(a)(5) and 403(c) because in the present case there is no evidence of any discrimination among users of the mails.

In conclusion, the statutes, regulations and policies at issue are not subject to judicial review but are instead left to the discretion of the Postal Service. Some of the regulations plaintiffs rely upon are not applicable to this case because they refer to issued stamps. None of the statutes, regulations or policies cited create an independent cause of action for their alleged breach by Postal Service customers. Therefore, the court must dismiss the complaint.

The court will enter an appropriate order.