Michael A. MORRIS, et al., Plaintiffs,

v.

Marvin RUNYON, Postmaster General
of the United States of America,
et al., Defendants.

Civ. A. No. 94–2098 (GK).

United States District Court,
District of Columbia.

Nov. 18, 1994.

Donald Louis Schlemmer, Myron George Hill, Jr., Washington, DC, for plaintiffs.

Stacy M. Ludwig, Asst. U.S. Atty., Washington, DC, for defendants.

## MEMORANDUM–OPINION

KESSLER, District Judge.

### I. Introduction

This case, brought by six stamp collectors and one stamp dealer against the United States Postal Service, involves a dispute over the fate of a postage stamp prepared by the Postal Service to commemorate Bill Pickett, a famous African–American cowboy. The Postal Service had intended to issue the stamp as part of its commemorative stamp program, in a 20–stamp sheet depicting American western celebrities and themes titled "Legends of the West." A few months before the Legends of the West stamps were scheduled to be officially distributed, the Postal Service discovered that the stamp featured a picture of Bill Pickett's brother rather than of Bill Pickett himself. Although the Postal Service recalled all of the stamps before their official release date, it soon learned that about 183 Legends of the West sheets containing the incorrect picture of Bill Pickett had been sold to private hands. Understandably, this very rare stamp quickly became a valuable item in the philatelic—or stamp—community and market.

Plaintiffs claimed that because they believed, based on a press release issued by Defendants, that the 5.2 million stamps bearing the same incorrect picture would be shortly destroyed by the Post Office, they invested between $2500 and $4700 to purchase the stamp. Nonetheless, to Plaintiffs' dismay, when the Postal Service learned that 183 stamps had escaped its recall, it changed its mind and decided to release 150,000 more of the stamps in order to "give everyone a chance to own a collectible." The release of these additional stamps will make Plaintiffs' stamps less rare, and, consequently, less valuable on the stamp market. Plaintiffs bring this lawsuit to prevent that result.

### II. Procedural History

On September 29, 1994, Plaintiffs filed Motions for a Temporary Restraining Order and a Preliminary Injunction in this action. In these Motions, Plaintiffs requested that this Court enjoin the Defendants from selling or issuing the Legends of the West Pickett Error stamp sheets ("Pickett Error Sheets"); declare that the sale or issuance of those stamps violates the United States Constitution as well as the United States Postal Service ("Postal Service") regulations; and order the Defendants to destroy all remaining Pickett Error Sheets.

On September 30, 1994, the parties entered into a Joint Stipulation, approved by the Court, in which the Plaintiffs agreed that the Defendants may proceed with all of their plans to identify the orders to be fulfilled for the Pickett Error Sheets and to prepare to fulfill the orders. Defendants agreed that they would not sell, distribute, or transfer title to the Pickett Error Sheets until December 1, 1994, as the Postal Service had previously set for distribution of the Sheets. The parties further agreed that the Joint Stipulation would not affect any of the Postal Service's plans to identify and to prepare to fulfill Pickett Error Sheet orders. Finally, the parties agreed that the hearing on Plaintiff's Preliminary Injunction on October 28, 1994 would also serve as the final hearing on the dispositive motion and merits of this case.

Accordingly, this matter is now before the Court upon Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction, and Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment.

For the reasons stated below, Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction should be **denied,**

and Defendants' Motion to Dismiss should be granted.[1]

### III. Statement of Facts [2]

Plaintiffs include six stamp collectors and one stamp dealer. Complaint, ¶¶ 2–8. Plaintiffs are all owners of a stamp called the "Pickett Error" stamp. They each paid between $2500 and $4700 for the "Legends of the West" sheet of stamps containing this stamp.[3] Defendants include the United States Postal Service ("Postal Service"), Sam Winters, Chair of the Board of Governors of the Postal Service, and Marvin Runyon, Postmaster General. Complaint, ¶¶ 9–11.

Defendant Postal Service was established by the Postal Reorganization Act of 1970, Pub.L. 91–375, 84 Stat. 719 (August 12, 1970) (codified at Title 39, United States Code), as an independent entity of the United States Government responsible for providing postal service throughout the country. 39 U.S.C. §§ 101(a), 201. Among its many functions, the Postal Service is authorized to "provide and sell postage stamps and other stamped paper, cards, and envelopes", to provide "special[,] [4] nonpostal, or similar services", and "to provide philatelic services".[5] 39 U.S.C. § 404(a). Pursuant to these provisions, the Postal Service markets postage stamps and other philatelic products.

Each year, the Postal Service issues approximately 40 to 41 billion stamps, of which nine billion are specially designed to honor and recognize events, people, and places that pertain to the cultural heritage of the United States. Declaration of Azeezaly S. Jaffer (Hereinafter, "Jaffer Dec.") ¶ 2. Designs for such stamps are selected by the Citizens Stamp Advisory Committee. *Id.*

On May 21, 1993, the Citizens Stamp Advisory Committee approved designs featuring American western celebrities and themes for twenty commemorative stamps to be sold collectively as a sheet titled "Legends of the West." Jaffer Dec. ¶ 3. The Postal Service scheduled the initial release of the sheets for March 29, 1994. *Id.* Production of the sheets commenced in August, 1993, and, shortly thereafter, 5.2 million "Legends of the West" sheets were distributed through normal channels directly from the production facilities to 330 postal facilities and stamp distribution offices throughout the country. *Id.*

On January 14, 1994, the Postal Service discovered that the sheets contained an error in the image of Bill Pickett, an African–American rodeo star. Jaffer Dec. ¶ 3. Specifically, the stamps contained the image of

---

1. Because the Court is granting Defendants' Motion to Dismiss, it will not be necessary to consider Defendants' Motion for Summary Judgment.

2. Plaintiffs stated in their Response to Defendants' Statement of Material Facts, filed with this Court pursuant to Local Rule 108(h), that they challenge only fact number 11 on Defendants' Statement of Material Facts. Pursuant to Federal Rule of Civil Procedure 56(e), this Court will treat all facts not explicitly disputed as conceded. *Celotex v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Some facts were discerned directly from the record. The Court is entitled to consider affidavits, depositions, exhibits, court judgments and orders, letters, transcripts of prior court proceedings, matters of public record and other materials outside of the pleadings in considering a motion under Federal Rule of Civil Procedure 12(b). *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure,* (2d Ed.1990 and 1994 Supp.) § 1364, at 475–481, and nn. 25–44.

3. Plaintiff Avakian purchased the stamp on May 17, 1994 for $4700 (Exh. 13); Plaintiff Stassen purchased the stamp in "July or August, 1994"

for $4500 (Exh. 17); Plaintiff Larson purchased the stamp on May 31, 1994 for $4150.00 (Exh. 16); Plaintiff Morris purchased the stamp on May 20, 1994 for $3700 (Exh. 18); Plaintiff Zuckerman purchased the stamp "about March, 1994" for $2500 (Exh. 19); Plaintiff Chorba purchased the stamp May 16, 1994 for $4700 (Exh. 20).

4. It is generally recognized that the absence of a comma between "special" and "nonpostal" was inadvertent. *See, e.g., Associated Third Class Mail Users v. United States Postal Service,* 405 F.Supp. 1109, 1117 n. 2 (D.D.C.1975), *aff'd, National Ass'n of Greeting Card Publishers v. United States Postal Service,* 569 F.2d 570 (D.C.Cir.1976) (per curiam), *vacated in part, United States Postal Service v. ATCMU,* 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977), *remanded, ATCMU v. United States Postal Service,* 662 F.2d 767 (D.C.Cir. 1980).

5. According to the Postal Service Regulations, "Philatelic products are designed and sold to promote the enjoyment and the informative value of stamp collecting." Domestic Mail Manual § 162.3.

Ben Pickett, Bill Pickett's brother, rather than that of Bill Pickett himself. *Id.*

On January 18, 1994, the Postal Service announced its decision not to issue the Pickett Error Sheets in their then current form. Jaffer Dec. ¶ 4. Furthermore, after consultation with the Pickett family, the Postal Service decided that the Pickett Error Sheets would be recalled and destroyed, and that an accurate Legends of the West sheet would be created, produced, and issued at a later date. *Id.* In reaching its initial decision to destroy the Sheets, the Postal Service did not consider the market value of the Pickett Error Sheets, if they were prematurely sold. *Id.*

In accordance with its announced decision, the Postal Service issued a recall order on January 18, 1994, for all of the Pickett Error Sheets that had been distributed to postal facilities. Jaffer Dec. ¶ 5. In a January 18, 1994 News Release, the Postal Service announced this recall, described the Postmaster General's explanation for the mistake, and attributed to the Postmaster General the statement that all of the Legends of the West stamps would be destroyed and reprinted with an accurate image of Bill Picket. Plaintiffs' Exhibit 3.[6]

An audit of the Pickett Error Sheets returned by Postal facilities, conducted with the U.S. Postal Service Inspection Service, established that 183 of the Error Sheets were missing, and that those sheets had been prematurely sold at four offices. Jaffer Dec. ¶ 5. Defendants did not authorize the sale of the sheets at these facilities. Jaffer Dec. ¶ 6. The Postal Service counseled and disciplined those employees who prematurely sold the sheets. *Id.* The Postal Service contacted persons known to have purchased the Pickett Error Sheets and asked them to voluntarily exchange the defective sheets for validly issued postage stamps. *Id.* The Postal Service has also revised its procedures for distributing stamps. *Id.*

After the decision to recall the sheets was announced, the Postal Service received hundreds of requests from the public to reconsider the decision to destroy the Pickett Error Sheets. Jaffer Dec. ¶ 7. When the audit was concluded, Azeezaly S. Jaffer, Manager, Stamp Services, U.S. Postal Service, conferred with Pickett family members regarding the 183 sheets that had been sold, and told them that the sold sheets would create a rarity in the philatelic community. *Id.* The Pickett family gave its reluctant acceptance to the proposed plan of the Postal Service to issue 150,000 more stamps to the public. Jaffer Dec. ¶ 7.

In June of 1994, the Postal Service decided to offer 150,000 sheets to the public on a one-per-customer basis by mail order from the Postal Service's Philatelic Fulfillment Service Center. Jaffer Dec. ¶ 8. Various factors contributed to this decision, including the avoidance of a philatelic rarity, the preservation of historical accuracy, the public's interest in the Pickett Error Sheets, the interests of the Pickett family, and the recovery of costs incurred by the Postal Service in producing the Pickett Error Sheets.[7] Jaffer Dec. ¶ 8.

Accordingly, on June 9, 1994, the Post Office issued a press release entitled "News-

---

6. Specifically, this news release, titled "Reprint Announced For Legends of the West Stamps— New Version Will Feature the Real Bill Pickett" read:

   WASHINGTON, D.C. (January 18, 1994)— The U.S. Postal Service announced today it is recalling its 20–subject Legends of the West stamp sheet from post offices after learning that the image of Cowboy Bill Pickett is believed to be his brother Ben.
   The stamps had been set to go on sale in late March.
   "Subjects selected for American stamps represent America's best. To release a stamp that's less that (sic) our best would be a disservice," said Postmaster General Marvin Runyon.

"As soon as we learned we had a problem, we wanted to do the right thing for American history and the Pickett family," he added.

.    .    .    .    .

All of the Legends of the West stamps, he said, will be destroyed and reprinted with an accurate image of Bill Pickett.... A new issue date has not been set.

7. In a June 28, 1994 letter to the President of Unicover Corporation, a major supplier of philatelic products, Mr. Jaffer explained the reasons why the Postal Service elected to sell a limited number of sheets:

   In reaching the decision to release 150,000 of the 5.2 million sheets, we recognize that this quantity would not adequately satisfy all the

break—USPS to sell 150,000 recalled 'Legends of the West' stamp sheets." Plaintiffs' Exh. 4 (*Hereinafter*, "Newsbreak"). Noting that the inadvertent sale of 183 Pickett Error Sheets led to "thousands of letters from collectors, dealers and cover manufacturers asking the Postal Service to reconsider its decision to destroy the stamps," the press release stated that the Post Office "wished 'to balance the interests of the philatelic community with its respect for the interests of the Pickett family.'" *Id.* (quoting Chairman of the Postal Board of Governors Sam Winters).[8] The news release instructed persons interested in obtaining a Pickett Error Stamp Sheet to send $8.70 (the $5.80 face value of the stamps plus a $2.90 shipping and handling fee) to the Philatelic Fulfillment Service Center between October 1 and October 31, 1994 (with orders to be filled according to date of postmark). *Id.*

The Postal Service announced that it would destroy the remaining stock of the Pickett Error Sheets, pursuant to Mr. Jaffer's discussions with the Pickett family. Jaffer Dec. ¶ 9.

The Postal Service considers the Pickett Error Sheets to be a defective product and does not seek or expect to profit from their

sale. Jaffer Dec. ¶ 10. Customers who mail requests (along with a check or money order for $8.70) postmarked between October 1, 1994 and October 31, 1994 addressed to the Postal Service's Philatelic Fulfillment Service Center in Kansas City, Missouri will meet the threshold eligibility requirement to purchase the sheets. *Id.;* Newsbreak, *supra.* The Postal Service will key orders into a database, identify eligible orders and respond to each entry that does not meet requirements or otherwise is not to be fulfilled under the procedures of the sale. *Id.* On or after December 1, 1994, the Postal Service will identify the orders to be filled and will mail and deliver Pickett Error Sheets to eligible purchasers. Contractors and postal employees will perform these functions at the Postal Service's expense. *Id.* The 150,000 Legends of the West sheets that are sold will be sealed in a protective sleeve bearing a message that the sheets are intended to be saved and not used and that the sheet contains an error in the image of Bill Pickett. *Id.*

The Postal Service stands to gain revenue in the amount of $1,305,000 in fulfilling orders for the sale. Jaffer Dec. ¶ 15. If the Postal Service is unable to fulfill orders (i.e., because of an injunction) for the Sheets according to its announced plans, it will incur

demands of the philatelic community, but it does not create a rarity. While there were a variety of factors and options to be considered, the major strategies that formed the foundation for our decision are as follows:
♦ Maintaining the integrity and credibility of the commemorative stamp program.
♦ Reiterat[ing] that values associated with the stamp program take priority over generating revenue.
♦ Minimiz[ing] perception of commercializing the inaccurate stamps.
♦ Minimiz[ing] the possibility of the inaccurate stamps overshadowing the correct version.
♦ Fulfilling our moral and ethical obligation to the name, image and likeness of Bill Pickett and his descendants.
The quantity of the stamp sheets to be sold was derived by dividing our costs by the face value of a sheet, thereby arriving at 150,000 sheets. Also, by limiting this sale to a very specific time period, and to a very specific process, we anticipate that only the most serious customers will take advantage of the opportunity. Finally, we ensured randomness (nondiscrimination) by selling on a "first-come, first-serve" basis, one to a customer.

Letter from Azeezaly S. Jaffer to James A. Helzer, dated June 28, 1994, attached as Exhibit 1 to Jaffer Declaration.

The Court is aware that Plaintiffs deny the accuracy of Defendants' stated reasons for their decision to release the 150,000 sheets. However, Plaintiffs put forth no evidence for their denial beyond purely speculative and unsubstantiated assertions that Defendants are not being truthful. Mere unverified denials are not sufficient to dispute the affidavit submitted by the Manager of the Postal Service's Stamp Services Division. Fed.R.Civ.P. 56; *Celotex v. Catrett, supra,* 477 U.S. at 324, 325, 106 S.Ct. at 2553, 2554, 91 L.Ed.2d 265 (1986); *Haase v. Webster,* 807 F.2d 208, 212 (D.C.Cir.1986).

8. The news release stated further:

After consulting with the Pickett family, the decision was made to sell 150,000 sheets of the original Legends stamps and to destroy the remainder, Winters said. "The decision was based on two factors. One it will alleviate collectors' concerns about the unintended rarity. Two, if sold out, the Postal Service will recover the cost of the original printing of the stamps," he added.

approximately $75,000.00 in wasted expenses that would not otherwise be incurred for processing, returning, and responding to orders, in addition to the in-house working hours and management attention required to terminate that process. Jaffer Dec. ¶ 14. If at some later date an injunction is lifted and the Postal Service is then permitted to release the 150,000 Pickett Error Sheets, it will incur approximately $663,175 in new costs to duplicate advertising for, processing, and fulfilling of new orders. Jaffer Dec. ¶ 16. As of October 11, 1994, the Postal Service received over 500,000 orders for the 150,000 Pickett Error Sheets. If the sale procedures are interrupted, all of these orders would have to be returned unfulfilled and then resubmitted and reprocessed at a later date if the sale is resumed. Jaffer Dec. ¶ 17.

It is not disputed that the release of the 150,000 Pickett Error Sheets will reduce the value of the Pickett Error Stamps held by Plaintiffs, although the amount by which the value of the stamps will decrease is disputed. Although Plaintiffs contend that the value of their stamps will be reduced to approximately $100 after the release of the 150,000 Pickett Error Sheets, one of the Plaintiffs paid $4500 for his Pickett Error Sheet in "July or August, 1994" (Exh. 17)—more than a month after the Postal Service issued its June 9, 1994 press release announcing the sale of the 150,000 additional stamps. At least as to that Plaintiff, the value of his Pickett Error Sheet was not diminished by the Postal Services June 9, 1994 announcement.

IV. *Defendants' Motion To Dismiss Must Be Granted*

A. *The Postal Service's Decision To Distribute Pickett Error Sheets Is Not Judicially Reviewable.*

Congress granted the Postal Service broad authority to "provide and sell postage stamps" and to "provide philatelic services." 39 U.S.C. § 404(a). In addition to granting the Postal Service this extensive authority, Congress also specifically exempted the Postal Service from the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA").[9] *See* 39 U.S.C. § 410(a); *National Easter Seal Society for Crippled Children and Adults v. United States Postal Service,* 656 F.2d 754, 767 (D.C.Cir.1981). In this case, Plaintiffs' challenge to the Postal Service's philatelic marketing practices is similar to the types of action that other Courts have already found to have been precluded by Congress in enacting the Postal Reorganization Act.[10]

Just recently, a federal district court in Wyoming addressed many of the same Postal Service regulations which are at issue in this case. Shortly after the Postal Service announced its plans for the sale and distribution of the Pickett Error Sheets, two vendors of philatelic products brought suit to enjoin the Postal Service's plans to destroy the remaining sheets and to require sale of the recalled sheets. *Unicover Corp. v. United States Postal Service,* 859 F.Supp. 1437 (D.Wyo.1994), *appeal docketed,* No. 94–8085 (10th Cir. August 29, 1994).[11] Plaintiffs Unicover Corporation and Mystic Stamp Company sought injunctive and affirmative relief in federal district court in Wyoming arguing that regulations published in the Domestic Mail Manual Transition Book (DMMT) required that the Postal Service sell all of the Pickett Error Sheets. *Id.* In a written opinion issued August 5, 1994, the *Unicover* Court dismissed Plaintiffs' Complaint, ruling that the decision regarding the disposition of the Pickett Error Sheets fell within the unreviewable discretion of the Postal Service. *Id.* at 1444–46.

9. There is no reason to infer, as Plaintiffs suggest, that because Congress deliberately exempted the Postal Service from the APA, it meant to subject the Postal Service's administrative decisions to review under pre-APA administrative law principles. *See Carlin v. McKean,* 823 F.2d 620, 622 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 784, 98 L.Ed.2d 870 (1988). Such a conclusion flies in the face of common sense.

10. Compare 39 U.S.C. § 410(a) (exempting the Postal Service from numerous federal laws governing federal entities).

11. Although Plaintiffs represented both in their Motion for Leave to Amend Complaint, filed October 11, 1994, and at oral argument that the appeal in this case has been dismissed, no verification of that fact has been brought to this Court's attention.

■ In finding the Postal Service's decision unreviewable, the *Unicover* Court based its conclusion largely on the principles set forth in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985):

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

*Id.* at 830, 105 S.Ct. at 1655. In short, an agency decision is not reviewable when there is "no law to apply" because the Court is without any standards to evaluate the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (*quoting* S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)); *Falkowski v. EEOC*, 783 F.2d 252, 253 (D.C.Cir.1986).

■ As the *Unicover* Court pointed out, the Postal Service regulations do not provide any standards which set forth how the agency is supposed to handle the inadvertent creation of a philatelic rarity. *Unicover, supra,* 859 F.Supp. at 1445. That Court further noted that the regulations neither contain a definition of a philatelic rarity, nor provide any guidance concerning when a philatelic rarity is created.[12] *Id.* Further, the Court noted that the regulations do not provide any guidance for determining "what actions the Postal Service must take, or not take, in order to 'not create a philatelic rarity'" or to what extent the Postal Service should "dilute a rarity if unintentionally created." *Id.*

The *Unicover* Court ultimately concluded:

In short, the regulations at issue simply do not direct the agency to take or avoid any specific action that is capable of judicial review. Instead, it is merely a statement of general goal or policy. How that goal or policy is achieved is left to the discretion of the Postal Service.

*Unicover, supra,* 859 F.Supp. at 1445.

This conclusion is consistent with *Protestants and Other Americans United for Separation of Church and State v. O'Brien*, 272 F.Supp. 712, 713 (D.D.C.1967), *rev'd on other grounds, Protestants and Other Americans United for Separation of Church and State v. Watson*, 407 F.2d 1264 (D.C.Cir.1968),[13] in which the Court held that the administrative discretion of the Postmaster General in selecting designs for postage stamps is nonreviewable. *See also Tedesco v. United States Postal Service*, 553 F.Supp. 1387, 1388 (W.D.Pa.1983) (holding that no jurisdiction exists to review the Postal Service's decisions in determining where to establish post offices); *Shelby Resources, Inc. v. United States Postal Service*, 619 F.Supp. 1546, 1548–49 (S.D.N.Y.1985) (holding that a challenge to Postal Service delivery schedules was not judicially reviewable); *Westwood Promotions, Inc. v. United States Postal Service*, 718 F.Supp. 690, 692–94 (N.D.Ill.1989) (holding that there is no judicial review of the grant or denial of postage refunds).

In short, the case law clearly establishes that because the regulations at issue contain no standards by which to judge the Postal Service's exercise of discretion, such discretion, as exercised in this case, cannot be reviewed.[14]

The only case which Plaintiffs can cite to the contrary is *Harris v. Day, et al.*, Civ. No. 3614–62, (1965) (National Archives) (attached as Exhibits 9–11 to Plaintiffs' Motion for Preliminary Injunction) to support their ar-

---

**12.** At oral argument on the pending motions, counsel agreed that the regulations had not changed and that they contained no definition of "philatelic rarity."

**13.** The District Court's decision in *Protestants* was reversed on appeal on the ground that Plaintiffs had standing to challenge governmental action in violation of the Establishment Clause of the First Amendment. *See* 407 F.2d at 1266. Because Plaintiffs have not alleged such a chal-

lenge (or, in fact, any Constitutional challenge, as will be discussed below), the *Protestants* decision cited above is still persuasive authority in the instant action.

**14.** In their Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, Plaintiffs actually concede that the underlying Postal Service Regulations themselves are not judicially reviewable. Plaintiffs' Opposition at 8.

gument that the Postal Service's decision is reviewable. Not only was no written opinion issued in this case, but it arose long before passage of the Postal Reorganization Act, and the Postmaster General was dismissed as a party. In short, it is of no relevance to the issues raised in this case.

Accordingly, this Court holds that the Postal Service's decision to sell a limited number of Pickett Error Sheets is not judicially reviewable, and, for that reason, Plaintiffs' Complaint must be dismissed for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### B. Plaintiffs Have No Private Right of Action Against Defendants To Challenge the Distribution of the Error Sheets

In their Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, Plaintiffs fail to even address, let alone challenge, Defendants' argument that Plaintiffs have no private right of action to challenge the Postal Service decision to release 150,000 additional Pickett Error Sheets. Instead, without any legal basis whatsoever, Plaintiffs argue that they have a cause of action based on "modern business management and business practice." Plaintiffs' Opposition at 21. Plaintiffs fail to demonstrate that Congress intended to create any private right of action in the Postal Reorganization Act, Pub.L. No. 91–375, 84 Stat. 719 (1970), and fail to cite any statutes or legislative history in support of their argument.

In enacting the Postal Reorganization Act, Congress sought to create a business-like entity free from the "serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices that

must be available if the American public is to enjoy efficient and economical postal service." H.R.Rep. No. 91–1104, 91st Cong.2d Sess. at 2, U.S.Code Cong. & Admin.News 1970, 3649, 3650. As the Supreme Court has stated, Congress "wished the Postal Service to be run more like a business than had its predecessor, the Post Office Department." *Franchise Tax Board of California v. United States Postal Service,* 467 U.S. 512, 519–20, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984). Congress anticipated that the reorganized postal system would function "with a greater degree of efficiency if it is removed from the ordinary channels, administrative controls, and legislative restrictions of other agencies in the executive branch." *National Easter Seal Society for Crippled Children and Adults v. United States Postal Service, supra,* 656 F.2d at 767 (*quoting* 116 Cong.Rec. 21, 709 (remarks of Sen. McGee)). Accordingly, to foster the efficiency of the redesigned Postal Service, Congress explicitly exempted it from, *inter alia,* the Administrative Procedure Act. *National Easter Seal,* 656 F.2d at 766.

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court held that in order to determine whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. These factors are: (1) whether the statute was enacted to benefit the Plaintiff; (2) whether there is evidence of legislative intent to create or deny such a right, explicitly or implicitly; (3) whether implying such a right is consistent with the overall purpose of the legislation; and (4) whether the alleged cause of action is in an area traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law.[15] *Id.*

Only the first three *Cort v. Ash* factors are relevant in the instant case since Plaintiffs do not deny that postal matters

---

**15.** Subsequent Supreme Court opinions indicate that the primary factor indicating whether a private right of action exists is Congressional intent, and that the four factors set forth in *Cort v. Ash* are actually "guides to discerning [Congressional] intent." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979) ("The first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose— are ones traditionally relied upon in determining legislative intent.")

have always been a federal concern. *See, e.g., Tedesco v. U.S. Postal Service, supra,* 553 F.Supp. at 1389. Analysis of these three factors compels the conclusion that Congress did not intend to create a private cause of action to challenge the Postal Service's handling of the Pickett Error Sheets.

Looking at the first factor under *Cort v. Ash,* there is absolutely no hint in the legislative history that either the Postal Reorganization Act or the regulations promulgated under it were intended to benefit individuals such as Plaintiffs, that is, the category of stamp investors. Rather, Congress intended to benefit the users of the U.S. mail by providing improved postal service. *Tedesco, supra,* 553 F.Supp. at 1389. Thus, *Cort's* first criteria for determining whether Congress intended to create a private right of action is not satisfied.

Second, there is no evidence of Congressional intent to confer a right or remedy on third parties such as Plaintiffs. As the *Unicover,* court pointed out, the provisions in the Domestic Mail Manual Transition Book ("DMMT")—which include the regulations at issue in this case—are internal instructions and are not intended to confer any substantive rights upon Plaintiffs. *Unicover, supra,* 859 F.Supp. at 1444. The Court explained that the DMMT:

> generally consists of matters committed to the discretion of the Postal Service ... There is no indication from the language of the regulations, or from the Postal Reorganization Act that the regulations were created or intended to especially benefit any persons.

Therefore, the Court concluded that the regulations upon which Plaintiffs premised their cause of action did not create a private cause of action in third parties. *Id.*

Third, implying a private cause of action under the Postal Service Regulations and statutory provisions relevant to this case would undermine, rather than be consistent with, the overall purpose of the Postal Reorganization Act. As explained above, the pur-

pose of the statutory reorganization of the Postal Service was "to permit the Postal Service to operate like a business and to respond with flexibility and imagination to the task of moving the mail." *Tedesco, supra,* 553 F.Supp. at 1391. "If this goal is to be effectuated, the courts must permit the Postal Service to Act like a business, without subjecting routine decisions to the cost and delay of judicial interference." *Id.* Accordingly, to read a private cause of action into these regulations promulgated as internal operating procedures would be directly contrary to what Congress was trying to accomplish by enacting the Postal Reorganization Act. *Id.*

In sum, none of the criteria set forth in *Cort v. Ash* are met in this case and, therefore, the Court concludes that Plaintiffs have no private cause of action to challenge the Postal Service's decision to release additional Pickett Error Sheets.[16]

## C. Plaintiffs Have Failed to State a Claim for Deprivation of Property

█ Plaintiffs contend that the Defendants have violated their Constitutional rights because the Postal Service's sale of 150,000 additional Pickett Error Sheets will diminish the value of those sheets they now own, resulting in a violation of the Fifth Amendment Takings Clause. Assuming, as the Court must for purposes of a Motion to Dismiss, that the value of Plaintiffs' stamps will decrease, Plaintiffs' argument fails in light of the "long established" principle that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" under the Fifth Amendment. *Concrete Pipe & Products of California v. Construction Laborers Pension Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993) (citing *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 405, 36 S.Ct. 143, 143, 60 L.Ed. 348 (1915) (92.5% diminution)).

---

**16.** Because the Court finds that the Postal Service regulations are nonreviewable, and that no private right of action exists to challenge the Postal Service's decision to distribute the addi-

tional Pickett Error Sheets, it is unnecessary to address Plaintiffs' argument about the unreasonableness of the Postal Service's decision.

■ While conceding that a mere diminution in value is insufficient to establish an unconstitutional taking, Plaintiffs claim, with no citation of authority, that diminution in value is merely one of "several factors" that must be considered. Plaintiffs' Opposition at 31. Unfortunately, Plaintiffs fail to set forth any "other factors" relevant to this case. Indeed, they cannot. None of Plaintiffs' rights of ownership or possession have been affected or curtailed. Plaintiffs are still able to do as they please with their stamp sheets—they may keep them, give them away, frame them, burn them, recycle them, trade them in for other stamps—or use them.[17] Thus, the only impact of Defendants' actions which Plaintiffs can identify is a diminution in the value of their stamps, which the Supreme Court has held is insufficient to constitute a taking cognizable under the Fifth Amendment. *Concrete Pipe & Products, supra,* —— U.S. at ——, 113 S.Ct. at 2291.

Furthermore, Plaintiffs' potential loss from the distribution of the Error Sheets pales in comparison to that experienced by the plaintiffs in *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), who also failed to state a constitutional claim under the Fifth Amendment. In *Andrus,* the plaintiffs were traders and appraisers of Native American artifacts. They challenged the constitutionality under the Fifth Amendment Takings Clause of federal regulations criminalizing the trade in eagle feathers. Even though the regulations, promulgated under the Eagle Protection Act, totally eliminated plaintiffs' ability to sell feathers they owned and had obtained from eagles which had been legally killed prior to the passage of the Act, the Supreme Court upheld the prohibition. *Id.* at 67–68, 100 S.Ct. at 327–28. The Court concluded that, because Plaintiffs were left with the rights to possess, transport, donate, and devise the birds and bird parts, there was no surrender or physical invasion of their property, and thus there was no "taking," even though Plaintiffs arguably lost their entire ability to trade in these artifacts. *Id.* at 66, 100 S.Ct. at 327. The plaintiffs in *Andrus* lost significant commercial use of their property—and no Fifth Amendment violation was found. Here, Plaintiffs will suffer far less—at most a loss in the value of their stamps when Defendants distribute the additional Pickett Error Sheets.

Similarly, in *Concrete Pipe, supra,* the Supreme Court held that no "taking" occurred when plaintiff companies alleged that application of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 would require the payment of 46% of their shareholder equity. The Court recognized that, even if 46% of plaintiffs' net worth had to be paid out in pension benefits, the government action imposing the penalty did not constitute a regulatory taking because it did not involve physical invasion or occupancy, but rather merely adjusted the benefits and burdens of economic life.[18] *Id.*

Accordingly, for the reasons stated above, the Court concludes that Plaintiffs have

---

**17.** Although it is not entirely clear, it appears that the one stamp on the 20–stamp stamp sheet bearing the inaccurate picture of Bill Pickett may not be usable for the purpose of postage. According to the *Unicover* court, the Pickett Error Sheets were never issued as United States postal stamps. When the 150,000 Sheets containing the Pickett Error Stamp are sold, the Pickett Error stamps will not be considered issued stamps. Nevertheless, the remaining 19 stamps on the sheet are identical to stamps to be issued in the official, accurate Legends of the West Sheet this fall. *Unicover, supra,* 859 F.Supp. at 1442. Nevertheless, since the Postal Service Regulations provide that defective or unserviceable stamps may be exchanged at full value, the Pickett Error Sheets will always have a redemption value. DMM § P014.1.1.

**18.** Further, the Court in *Concrete Pipe* also noted that the government regulation could not have seriously interfered with plaintiffs' "reasonable investment-backed expectations" because the plaintiffs were engaged in business in a field that was highly regulated in the first place. *Id.* Similarly, in the case at bar, Plaintiffs cannot complain of government interference in the stamp market—since it was the Postal Service which creates and regulates the markets for commemorative stamps in the first place. In other words, Plaintiffs possessed no "reasonable investment-backed expectations" because they voluntarily engaged in the secondary market for stamps—a market that is created by Defendants themselves by selling stamps and related items, and that can be affected at any time by Defendants' discretionary acts.

failed to state a claim under the Takings Clause of the Fifth Amendment.[19]

### D. Plaintiffs' Promissory Estoppel Claim Must Be Dismissed For Failure to State a Claim

Finally, Plaintiffs claim that Defendants are liable to them under a theory of promissory estoppel. The facts alleged by Plaintiffs, however, fail to state such a claim, and, accordingly, such claim must be dismissed under Federal Rule of Civil Procedure 12(b)(6).

■ Initially, it most be noted that promissory estoppel does not apply against the federal government to the same extent that it may be applied to the private sector. *See McCauley v. Thygerson*, 732 F.2d 978, 980–81 (D.C.Cir.1984) (citing *Kizas v. Webster*, 707 F.2d 524, 535 (D.C.Cir.1983)) ("Courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel"); *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981) (declining to find a cause of action in promissory estoppel against the government).[20]

■ In any event, even if the general presumption against applying promissory estoppel against the government is overcome, Plaintiffs have, nonetheless, failed to state a claim under the doctrine.[21]

In order to state a claim for promissory estoppel, Plaintiffs must allege: (1) the existence of a promise; (2) that the government expected the Plaintiffs to rely on the promise by taking definite and substantial action or by forbearing from such action; (3) actual detrimental reliance by Plaintiffs; and (4) that the promise must be enforced to avoid injustice. *Robbins v. Reagan, supra,* 780 F.2d at 53 (citing *Granfield v. Catholic Uni-*

19. Because the facts alleged by Plaintiffs fail to state a claim for an unconstitutional taking under the Fifth Amendment, it is not necessary to address Plaintiffs' argument that the Postal Service's actions in distributing the 150,000 additional Pickett Error Sheets were not taken for a public use.

20. It is not even clear that the federal government has waived sovereign immunity with respect to claims asserting promissory estoppel. *See Robbins v. Reagan,* 780 F.2d 37, 52–53 (D.C.Cir.1985) (declining to address the question). One United States Court of Appeals has found that the government has not waived its sovereign immunity with regard to a promissory estoppel cause of action. *Jablon v. United States, supra,* 657 F.2d at 1070.

21. Plaintiffs rely on *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) for the argument that they have stated an actionable claim against the government in estoppel. *Heckler* is inapplicable because that case deals with a claim for equitable estoppel rather than promissory estoppel. This distinction seems to elude Plaintiffs. While promissory estoppel claims involve claims for enforcement of a promise, equitable estoppel serves as a bar against a party from asserting a theory of relief. *Jablon v. United States, supra,* 657 F.2d at 1068 ("Promissory estoppel is a sword, and equitable estoppel is a shield."). Accordingly, *Jablon* held that equitable estoppel cases are inapposite to promissory estoppel actions against the government. *Id.* at 1069.

Even if equitable estoppel cases could be applied in the promissory estoppel context, as here, Plaintiffs have failed to state a claim for equitable estoppel. First, they are not seeking to bar the government from taking any action against them. Second, they have not met the high standard necessary to state a claim for equitable estoppel. In *Heckler* the Court held that "when the Government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of governmental deception ... This principle also underlies the doctrine that an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." Here, there is no evidence of governmental deception. Further, Plaintiffs have not demonstrated that the acts of Defendants did not meet the "minimum standard of decency, honor and reliability" referred to in *Heckler.*

In fact, Plaintiffs' alleged plight at the hands of government action cannot compare with the facts supporting the claim for equitable estoppel in *Heckler.* In *Heckler,* the Plaintiffs, non-profit health services organizations, received and expended $71,480 in federal funds to provide health care services to Medicare beneficiaries. This receipt of funds was based on an incorrect interpretation of federal regulations. The plaintiffs argued that the government was estopped from recovering those funds because plaintiffs relied on the express authorization of a responsible government agent in making the expenditures. The Supreme Court, in denying the arguments of the non-profit Medicare providers, held that the actions of the government agent in making the incorrect oral representations regarding the funds did not rise to the level of affirmative government action justifying a claim of estoppel. 467 U.S. at 66, 104 S.Ct. at 2227.

*versity,* 530 F.2d 1035, 1039 (D.C.Cir.), *cert. denied,* 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); Restatement (Second) of Contracts § 90 (1981)).

Accepting as true all material allegations in the Complaint, affording Plaintiffs all reasonable inferences that can be drawn therefrom, and construing those facts and inferences in a light most favorable to the Plaintiffs—as the Court must for the purpose of a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)—it is apparent that the facts alleged by Plaintiffs have failed to state any one of these elements.

### 1. The facts alleged by Plaintiffs do not constitute the making of a promise by Defendants

■ Plaintiffs contend that the January 18, 1994 press release issued by the Postal Service contained the promise that is the basis of their promissory estoppel claim. Specifically, the portion of the release said to constitute this promise is contained in the following sentence:

> All of the Legends of the West stamps, he said,[22] will be destroyed and reprinted with an accurate image of Bill Pickett, a legendary Black cowboy who died in 1931.

Press Release, Plaintiffs' Exh. 3. The governing case law is clear that this statement, even if attributed to the Postmaster General as Plaintiffs allege, cannot be said to constitute anything more than a statement of future intention. It is well settled that a mere statement of future intention does not rise to the level of a binding promise and cannot be relied upon for promissory estoppel purposes. *In re Phillips Petroleum Securities Litigation,* 697 F.Supp. 1344, 1354 (D.Del. 1988), *affirmed in part, vacated on other grounds,* 881 F.2d 1236, 1250 (3rd Cir.1989), *on remand,* 738 F.Supp. 825 (D.Del.1990).

The statement at issue merely communicated the Postal Service's future intention to destroy the Pickett Error Sheets at an undefined place and time. Plaintiffs do not allege that they were or are personally acquainted with Defendants, and do not allege any face-to-face or direct communication regarding the destruction or release of the Pickett Error Sheets. Plaintiffs, moreover, do not allege that they sought assurance from responsible officials in the Postal Service before purchasing the sheets. *Cf. Heckler v. Community Health Services, supra,* (declining to apply principles of equitable estoppel against the government even though the Plaintiff had relied on the express oral representations of a responsible government agent). Accordingly, Plaintiffs have not alleged facts which, if proven, would constitute a promise.[23]

### 2. Plaintiffs have not alleged facts which demonstrate any expectations on the part of Defendants

■ Plaintiffs have alleged no facts which, if proven, would establish the existence of any expectations on the part of Defendants regarding Plaintiffs' investments in the Pickett Error Sheets. Specifically, nothing exists in the press release of January 18, 1994 suggesting or implying that the Postmaster General hoped or expected that holders of prematurely released Pickett Error Stamps would create a market for speculation in them. In fact, the press release suggests (and the record reveals) that Defendants were not aware of the existence of any prematurely released stamps at the time of the press release. Press Release, Plaintiffs' Exh. 3, *supra* (stating that *"all* of the Pickett Error Stamps" would be destroyed and replaced). Indeed, according to the facts alleged in the Complaint, the Postal Service did not learn of the 183 prematurely released Pickett Error Sheets until a few months *after* it announced its recall. *See also* Jaffer Dec. ¶¶ 5, 7. Accepting all of Plaintiffs' assertions at face value, Defendants simply could not

---

**22.** The press release does not contain a direct quote on this issue, and, even more importantly, does not attribute this statement explicitly to any speaker. Nonetheless, the context suggests, and Plaintiffs contend, that the statement can be attributed to Postmaster General Runyon, a Defendant in this action.

**23.** Plaintiffs also suggest that the Postal Service's decision to sell the Pickett Error Sheets is analogous to applying a new rule retroactively. This argument is unavailing. The Postal Service decision was not a rule promulgated by the agency; rather it was—as Plaintiffs concede in their Motion for Preliminary Injunction at page 12—a policy decision, and Plaintiffs fail to cite any authority to the contrary.

have any expectations about Plaintiffs' reliance when they did not even yet know that prematurely released Pickett Error Stamps were in existence.

Consequently, Plaintiffs have failed to allege any facts which could establish the existence of the second requirement of a promissory estoppel claim.

### 3. Plaintiffs have not alleged facts which establish the existence of actual detrimental reliance

Although Plaintiffs claim that they relied upon assertions of Defendants when purchasing the Pickett Error Stamps, the facts underlying their claim of reliance belie any actual reliance on the part of Plaintiffs.

Individual Plaintiffs have declared that, when purchasing their Pickett Error Sheet, each one relied on the United States Postal Service statements of January 18, 1994, and the philatelic press reports of the Postal Service's announcement that all Pickett Error Sheets would be destroyed. Plaintiffs' Exhibits 13, 16–20, attached to their Motion for Preliminary Injunction. Nonetheless, Plaintiffs also claim that Plaintiff Stassen's stamp purchase in July or August of 1994 was made in reliance on the Postmaster General's statement, despite the fact that the Postal Service announcement to sell 150,000 additional Error Sheets occurred more than one month *earlier*. Plaintiffs' Exhibit 17, attached to their Motion for Preliminary Injunction. Accordingly, accepting the Plaintiffs' facts as alleged in the Complaint, the actual reliance of at least one of the Plaintiffs is, on its face, dubious at best.

Furthermore, Plaintiffs have failed to allege any facts from which it could be concluded that their reliance, if it existed, was reasonable. Plaintiffs claim to be participants in a market that exists by reason of the Postal Service philatelic programs and thus they must reasonably anticipate that market conditions may be affected by changes in circumstances and policy considerations. Plaintiffs, being fully aware of the January 18, 1994 press release when they bought their

stamps, as they now assert, must have known that they were dealing in Pickett Error Sheets that had escaped the recall, and therefore were rarities, particularly given their price tag of several thousand dollars.[24] Presumably, Plaintiffs had some familiarity with stamp rarities, as each claims to be a collector of long standing or an experienced stamp dealer. Indeed, Plaintiffs themselves note that the Postal Service followed a similar course of action as it did here when it was discovered that a printing error in four sheets of the 1962 Hammarskjold commemorative stamps had been released. The Postmaster General then ordered the printing and sale of additional printing errors to avoid a rarity. Plaintiffs' Motion for Preliminary Injunction at 22–23. Given this historical knowledge, Plaintiffs cannot claim, if there was any reliance on the first announcement of the Postal Service, that it was reasonable.

Consequently, accepting all of the facts as alleged in the Complaint, Plaintiffs have not alleged facts demonstrating that they reasonably thought that they could assume that the January 18, 1994 Postal Service press release was, in effect, the Postmaster General's invitation to deal in the prematurely sold Pickett Error Sheet rarities.

### 4. Plaintiffs have not alleged facts that establish that enforcement of the alleged promise is necessary to avoid injustice

Plaintiffs have alleged insufficient facts to establish that justice would be served by prohibiting the Postal Service from distributing the 150,000 Pickett Error Sheets in December. The record reveals that the Postal Service balanced several factors in making its determination to distribute an additional 150,000 Pickett Error Sheets, including the interests of the stamp collecting public and those of the Pickett family. Jaffer Decl. ¶ 8. As explained above, it is not the province of this Court—and indeed this Court has no jurisdiction—to second-guess the discretionary administrative decision made by the Postmaster General in carrying out his duties. The only injustice that Plaintiffs can claim is the fact that the decision of

24. Since all of the Plaintiffs purchased their stamps after the January 18, 1994 recall (and indeed concede their knowledge of the recall), the legality of Plaintiffs' purchases may also arguably be questioned.

the Postal Service will reduce the rarity of their Pickett Error Sheets, thereby diminishing the value of their investment in these sheets which they purchased at their own peril.

In sum, Plaintiffs have failed to articulate facts which state a promissory estoppel claim against Defendants.[25]

## V. Plaintiffs' Request For Injunctive Relief Must Be Denied

Four factors must be considered in the decision to grant a Preliminary Injunction:

1. Is there a substantial case on the merits?

2. Has the petitioner shown that it will be irreparably harmed if relief is not granted?

3. Would the issuance of a stay substantially harm other parties interested in the proceedings?

4. Where lies the public interest?

*Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam); *Washington Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977); *Sea Containers, Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989).

Plaintiffs have not satisfied any of these four factors. First, as discussed above, Plaintiffs' have failed to demonstrate a substantial case on the merits. Second, Plaintiffs have not demonstrated that they will suffer irreparable harm if the Court denies them injunctive relief, as economic loss

alone—in particular, theoretical economic loss—does not constitute irreparable harm. *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985). Third, the threatened injury to Defendants and others outweighs the possible harm to Plaintiffs because, if the Postal Service is unable to fulfill orders for the Pickett Error Sheets according to its announced plans, it will incur substantial delay and expense in bringing the current process to a halt, and still further expense in reestablishing the process again should events unfold to allow it. Jaffer Dec. ¶¶ 13 and 14.[26] Finally, Plaintiffs have not shown that the public interest would be served by the entry of an injunction in this case, and, in fact, the record, as discussed above, demonstrates the contrary.

It is well established that injunctive relief is an "extraordinary remedy." *See, e.g., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Such relief is not warranted in this case. Plaintiffs' Motion for Preliminary Injunction must be denied.

## VI. Conclusion

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction must be *denied,* and Defendants' Motion to Dismiss must be *granted.*[27]

---

25. Finally, the Court recognizes that Plaintiffs state, in brief references, that the Postal Service decision violated the Equal Protection Clause and the Substantive Due Process Clause of the Fifth Amendment (Plaintiffs' Motion for Preliminary Injunction at 14, 18, 21); yet they completely fail to articulate how the Constitution is violated. Indeed, an Equal Protection challenge begins with the premise that one individual or group is treated differently than another individual or group. *See, e.g., Dumaguin v. Secretary of Health and Human Services,* 28 F.3d 1218, 1222 (D.C.Cir.1994). Plaintiffs have made no such claim here.

Likewise, Plaintiffs' substantive due process claim is meritless. "Substantive due process

prevents government power from being 'used for purposes of oppression' or 'abuse of government power that shocks the conscience'" or "action that is 'legally irrational [in that] it is not sufficiently keyed to any legitimate state interests.'" *Committee of U.S. Citizens in Nicaragua v. Reagan,* 859 F.2d 929, 943–44 (D.C.Cir.1988) (numerous citations omitted). The sale of Pickett Error Sheets hardly rises to this level.

26. See discussion, *supra,* at page 367.

27. Because the Court is granting Defendants' Motion to Dismiss, it will not be necessary to consider Defendants' Motion for Summary Judgment.